Richmond

## CHARLIE SPRUILL

### V.

## COMMONWEALTH OF VIRGINIA

October 10, 1980.

Record No. 791532.

Present: All the Justices.

*James A. Butts, III,* for appellant.

*Robert E. Bradenham, II, Assistant Attorney General (Marshall Coleman, Attorney General,* on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this criminal appeal, we consider whether the trial court erroneously refused to admit certain testimonial evidence and whether the court misdirected the jury.

Defendant Charlie Spruill was convicted of rape and abduction, and sentenced to imprisonment for life and ten years, respectively. We awarded defendant an appeal from the June 1979 judgments of conviction.

On Friday, July 14, 1978, about 2:00 p.m., the victim was abducted at knife-point from a downtown parking area in Chase City, taken to a remote part of Mecklenberg County, and raped. On the date of the crimes, defendant was charged with the offenses and arrested. Upon the arrest, he signed a statement admitting the intercourse but claiming it was consensual.

Defendant was initially tried by the court sitting without a jury on October 18, 1978, and pleaded guilty to the charge of abduction and not guilty to rape. The court found defendant guilty of both offenses and ordered a presentence report. From a review of the report, the trial judge learned defendant had apparently experienced "serious mental problems since 1975." The court decided that defendant's mental history had not been "developed in depth at the [October] trial" and, accordingly, found defendant had not received a fair trial. Thus, in February of 1979, the court voluntarily declared a mistrial "in the interest of justice."

Upon the retrial, from which this appeal stems, defendant pled not guilty to both charges. During presentation of defendant's evidence, he offered the testimony of a psychologist and a psychiatrist over objection of the Commonwealth's Attorney. The prosecutor argued, without success, that because defendant had failed to plead not guilty by reason of insanity, he was precluded from offering psychiatric evidence. After defendant's psychologist and psychiatrist testified, the Commonwealth offered in rebuttal the testimony of a psychiatrist employed by the State. The first three issues on appeal arise from evi-

dentiary rulings made by the trial court during the course of the testimony about defendant's mental condition.

## I.

The psychiatric evidence offered by defendant, who was age 26 at the time of trial, showed that he had been hospitalized at Central State Hospital in Petersburg on three separate occasions during the three-year period immediately preceding the commission of the instant offenses. During the periods between hospitalizations, defendant had been counseled and had received psychotherapy and psychiatric treatment through the Mecklenburg Mental Health Services, located in Boydton, which served the community of defendant's residence. According to the testimony, defendant's mental condition was diagnosed as chronic schizophrenia, paranoid type.

During the direct examination of defendant's psychologist, Gregory L. Anderson, who was the Center Director of the Mecklenburg Mental Health Services, the witness was asked to express his opinion about defendant's mental condition on the date of the offenses and this colloquy occurred:

Q. [by Mr. Butts, counsel for defendant]: Would it also be your conclusion that at the time he was mentally ill?
MR. HARRIS [Commonwealth's Attorney]: I object.
THE COURT: Is this a psychiatrist we are talking about?
MR. BUTTS: No, Your Honor, he is a clinical psychologist.
THE COURT: I don't think he is qualified.
MR. BUTTS: Very well.
THE COURT: I'm not ruling—you haven't seen fit to qualify him. I just wondered if he is or whether he considers himself one. That's a highly technical question you are asking.
MR. BUTTS: I can either try to qualify him or if Mr. Harris is going to object to it, I won't pursue it and I will put on the psychiatrist.

And defense counsel did not pursue that issue further.

On appeal, defendant argues the trial court committed reversible error in refusing to allow the clinical psychologist "who was thoroughly familiar with the defendant's history to testify as to the defendant's mental illness." We reject that contention. The defendant failed to object with reasonable certainty to the trial court's ruling that the witness was not qualified to give the opinion sought. Rule 5:21. Indeed, defendant acquiesced in the court's decision by re-

sponding, "Very well" to the court's statement and by saying he would not "pursue" the issue but would call the psychiatrist as a witness. On appeal, we will not entertain objection to a ruling which the protesting party assented to at trial.

## II.

The defendant's psychiatrist, Dr. Henry Pope, was a South Boston specialist who had examined defendant in the local jail during the week before trial and who had reviewed defendant's medical records. During the course of his testimony, the witness agreed that, in summary, his opinion was that defendant was a schizophrenic, paranoid type; that such category covered "a multitude of types of mental problems"; and that he had not said defendant was insane or psychotic. Pope was then asked during direct examination whether on the day of the offenses "defendant had the capacity to appreciate the nature and consequences of any acts that he might have committed?" Upon objection by the prosecutor, the psychiatrist was examined out of the jury's presence. During that phase of the interrogation, defense counsel asked Pope whether on the day of the crimes defendant "was suffering from such mental disease or defect that he lacked substantial capacity either to accept the responsibility of his conduct or conform his conduct to the requirements of the law?" The witness responded, "Well, I couldn't say." Then counsel asked Pope whether there was a "possibility" defendant was insane on the day in question, to which he responded, "It's a possibility, yes." The trial court refused to permit the testimony to go to the jury, ruling the physician's response to the question was "purely speculative." The court noted: "He didn't say he was insane. He said it was a possibility, but that he couldn't say."

Defendant argues the court below erred in refusing to allow his psychiatrist "to testify as to the defendant's mental condition." We disagree. A medical opinion based on a "possibility" is irrelevant, purely speculative and, hence, inadmissible. In order for such testimony to become relevant, it must be brought out of the realm of speculation and into the realm of reasonable probability; the law in this area deals in "probabilities" and not "possibilities."

## III.

The Commonwealth's psychiatrist, Dr. James C. Dimitris, who testified in rebuttal, had seen and examined defendant many times at Central State Hospital during the period from the onset of defendant's

mental problems to the time of the second trial. For example, Dimitris, the Director of the Forensic Unit at Central State, had conducted a court-ordered examination of defendant before the first trial and reported in September of 1978

> that even though [defendant] is basically a chronically ill individual (chronic schizophrenic) he is currently neither feebleminded nor insane and he is considered capable of participating in the necessary legal proceedings.

> \* \* \*

> . . . In summary we would like to state that first, the patient is clearly able to understand and differentiate between right and wrong; secondly, he is able to stand trial and third; his physical condition is satisfactory. . . .

Then, after the October 1978 trial and preliminary to sentencing, Dimitris, who did not testify in the first trial, was requested in a December 1978 court order to review defendant's Central State medical records and to report to the court the physician's "medical opinion as to the mental capacity of the defendant." In transmitting an attested copy of that order to the physician, the prosecutor wrote:

> Both the Judge and I are concerned as to the proper disposition or penalty to impose upon this man due to his mental condition. We are concerned as to whether he should be sentenced to the penitentiary or whether he should be committed pursuant to Section 19.2-181 of the Code of Virginia. Before making a final decision in these cases the Judge ordered me to write to you and request a review of all the records in your hospital relating to Spruill's condition. We would like the benefit of your expert opinion as to whether Spruill should be treated as mentally incompetent and confined for treatment or whether he should be adjudged mentally competent and handled under a penitentiary sentence.[*]

---

*Code § 19.2-177 provides that if any person, after conviction and sentencing for any crime, and while serving such sentence in any penal institution is declared to be insane or feebleminded, he shall be committed by the court to the proper hospital and kept there until he is restored to sanity.

Code § 19.2-181 provides that if an accused is acquitted on the ground of insanity or feeblemindedness, the court shall place defendant in the custody of the State Commissioner of Mental Health and Mental Retardation to thereafter remain in the Commissioner's custody or be released, depending on the defendant's mental condition, according to specific procedures set out in the statute.

On December 13, 1978, the physician responded to the court-ordered request in a letter which is the focus of the present issue. The report, addressed to the trial judge, stated:

We have received your Court Order of December 11, 1978 for a review of the hospital records relating to the confinement and treatment of the above-named individual whose sentencing is pending in your Court.

Mr. Spruill was first admitted to Central State Hospital on a voluntary basis on May 16, 1975. This admission followed an incident when he was reported to have suffered a blackout and was involved in a motor vehicle accident as a result. On admission to the hospital he was reported as confused, with auditory hallucinations and blocking of his thought processes. He was found to be psychotic by the Staff and was diagnosed as Schizophrenia, Acute Schizophrenic Episode. He was released from the hospital one month later on a convalescent leave status with recommendation that he attend the mental aftercare clinic and continue on his medication. He was finally discharged from the hospital records September 16, 1976, after having spent another brief period in the hospital with a release on convalescent leave the second time being March 26, 1976.

The patient was admitted to the hospital the second admission on Feburary [sic] 11, 1977 on involuntary certification papers which were completed after he appeared in the Court talking irrelevantly. On admission to the hospital he was found to be irrational, could not carry on a coherent conversation, there was pressure of speech, looseness of association and lack of insight or judgment. Diagnosis was made of Schizophrenia, Chronic Undifferenatied [sic] Type. The patient was released on convalescent leave status on March 1, 1977 with recommendation that he continue on his medication and have followup services. He was discharged from the hospital records on August 11, 1977.

Mr. Spruill was readmitted to the hospital November 17, 1977. This admission was on a Court Order from the Mecklenburg County General District Court for observation and report as to his mental condition prior to trial (pursuant to the provisions of Section 19.2-169 of the Code of Virginia). On that admission he was found to be psychotic, being grandiose, preoccupied with religion, with a short attention span, agitated, yelling, singing

hymns and generally not engaging in any sort of conversation. The diagnosis entered was Schizophrenia, Paranoid Type. The report was made to the Court that Mr. Spruill was found to be mentally disorganized and in need of continued hospitalization and treatment. On February 15, 1978 we received a response from the Court that they were in agreement with the recommendation that Mr. Spruill be involuntarily certified and sent to the Civil Side of the hospital with a notice being given to the Court 10 days prior to his release so he could be returned for trial if the Court wished such.

The patient was involuntarily certified and transferred to the Civil Side of the hospital. There they reported to Judge Waller in a letter of March 10, 1978 that Mr. Spruill was improved in his mental condition and recommended his release from the hospital on convalescent leave. This leave took place on March 24, 1978.

The record reflects that after leaving the hospital on March 24, instead of adhering to the recommendations that he attend the mental aftercare clinic and take his medication he gave lip service to the aftercare program and was self-medicating himself with alcohol and marajuana [sic], as he explained to the clinic people later. When he was readmitted to the Forensic Unit on August 18, 1978 on your Court Order he was charged with rape and abduction. At the time of the evaluation he appeared to be alert, fairly oriented, accessible, friendly and cooperative; yet, whenever talking about the alleged offenses he remained constantly evasive and smiled slightly. On the subject he later indicated that he met the victim in question in the countryside and she offered him a ride. After they drove to a certain secluded place in the country, on her invitation, they were involved in a sexual act.

The diagnosis in this case remains one of chronic schizophrenia. This is a mental illness which in the acute state usually is manifested by inability of the afflicted individual to test for and appreciate reality within himself and/or the environment. In the chronic state the thought disturbance is not so profound even though the person has a spasmodic work record, easily gives up and gets discouraged and at times the emotional expresses are quite inappropriate to subjects discussed. In other words, while he is discussing a serious, sad matter can laugh and vice versa.

As a suggestion for consideration by the Court, we would like to propose the idea that if Mr. Spruill is found guilty to the charges involved, after the imposition of the sentence, he could be sent back to Central State with a new order, after conviction and sentence under Section 19.2-177 of the Code of Virginia. In the event the present condition is precarious, the man would be maintained in the Unit for as long as necessary to make a good recovery, then we will recommend that he be classified into an appropriate unit of the Department of Corrections where he can be involved in educational and vocational activities commensurate with his abilities and also receive psychological and psychiatric followup. If he would show regression in his mental condition he would have direct access for readmission to our Unit for further care and treatment.

Furthermore, we would like to submit that if the events of the day of the offense do not clearly show evidence of insanity and if this man will be classified as an insane person according to Section 19.2-181 then he will learn nothing from this adventure and he will feel that he has permission to be nasty against society because of his previous mental illness.

I trust this review and information will be of service to the Court in the disposition of the matter. Please let me know if we need to elaborate further.

Subsequently, the mistrial was declared and in April of 1979 the trial court ordered defendant returned to Central State for "observation and evaluation." Thereafter, Dimitris studied the transcript of the first trial, talked to the victim, and interviewed the defendant in the presence of Anderson, the clinical psychologist. In a report to the court dated about three weeks before the instant trial, Dimitris rendered his opinion on defendant's mental condition at the time of the offenses as follows:

[I]t is my opinion that even though the accused is basically a chronically mentally ill individual, and furthermore, even though he might have been under the influence of some quantity of alcoholic beverages, he was still able to understand the nature, quality and consequences of his acts and he was able to distinguish between right and wrong.

Later, during his direct testimony at trial, the psychiatrist gave the same opinion, stating defendant was not insane or feebleminded at the time of the criminal acts.

During cross-examination, defendant attempted to use the physician's December 13 letter, and specifically the penultimate paragraph, to impeach the witness, but was prevented from doing so when the trial court sustained the prosecutor's objection to use of the letter or any part of it.

Defendant claims this action of the court below was error and denied him "the right of cross-examination." He says the letter as a whole and the next-to-last paragraph in particular "shows prejudice, uncertainty and the opinion of the witness that the mentally ill defendant should not be treated as such." Defendant further argues "the letter was clearly admissible under Virginia law either to show bias or prior inconsistent statements," citing Code § 19.2-268.1 which provides for contradiction of a witness in a criminal case by the use of a prior inconsistent statement in writing. We do not agree.

A meticulous analysis of the letter, in the light of defendant's argument and the testimony of the witness, demonstrates the letter should not have been used during cross-examination for any of the reasons defendant assigns, even though from a superficial glance at the report it appears to contain impeaching material. We do not think the letter evinces Dimitris was prejudiced, uncertain or biased. Nor do we believe that the letter exhibits an opinion by the witness that "the mentally ill defendant should not be treated as such" or that it is inconsistent with or contradictory of his testimony at trial.

Turning to the letter, the second through sixth paragraphs contain an objective summary of defendant's medical history at Central State from May of 1975 through August 18, 1978. Dimitris' trial testimony, based on supplemental information received through examination of the victim and the defendant in 1979, was entirely consistent with the information in the report.

The seventh paragraph contains the diagnosis, which was the same opinion Dimitris gave at trial. In that paragraph, as at trial, the physician pointed out the distinction between the chronic and acute states of schizophrenia. He testified, in essence, that in an acute state, a schizophrenic "is not experiencing reality" while in the chronic state he "is in contact with reality." He also testified that at the time of the crimes defendant was in the latter category.

In the eighth and penultimate paragraphs, Dimitris responds directly to the prosecutor's letter request generated by the trial judge's concern "as to the proper disposition or penalty to impose upon" defendant following the first trial. The physician's guidance had been sought upon whether defendant should be adjudged sane and receive treatment according to the procedure set forth in Code § 19.2-177,

*supra,* or whether defendant should be found mentally incompetent and confined for treatment under Code § 19.2-181, *supra.* Accordingly, in the eighth paragraph, Dimitris outlines the procedure which could be used under the former statute. Then in the next-to-last paragraph he gives his opinion on the effect upon defendant should the fact finder, through error, find defendant not guilty by reason of insanity when, as Dimitris believes, defendant actually is legally sane. He points out that, in his opinion, such a result will give defendant an excuse to continue unlawful behavior because of his previous mental illness.

There is nothing contradictory or inconsistent in these paragraphs when compared to Dimitris' testimony at trial. And those statements may not properly be construed to express a view that one who is mentally ill "should not be treated as such." Dimitris consistently repeated his opinion that defendant was not insane or feebleminded at the time of the crimes nor was he acting upon an irresistible impulse. Thus he was of opinion that defendant was sane and should be treated accordingly; not that defendant was insane but should be treated as sane, as defendant characterizes the physician's opinion.

Defendant dwells on the penultimate paragraph and the portion stating defendant will learn nothing from the "adventure" if he is found not guilty by reason of insanity, thus allowing him to feel he has permission to be "nasty against society." Pressed at the bar during oral argument to elaborate on the conclusory contention that the paragraph shows bias and prejudice, defendant urged that the sentence, as well as the whole report, shows Dimitris had prejudged defendant's mental condition "before he had done the examination [conducted] after the date of the alleged offense." Defendant argued "a fair reading of that statement [shows] that Dr. Dimitris intended to or felt that he would find that Charlie Spruill was sane." He says that Dimitris' ultimate "conclusion was no more than the concrete result of what his assumption was. That, we think, was the prejudice."

We are not persuaded by that argument, keeping in mind that determination of the scope of cross-examination in general, and of the extent of testimonial impeachment in particular, should be "left largely to the sound discretion of the trial court; and the rule is well established that an appellate court will not interfere, unless that discretion has been plainly abused." *Worrell* v. *Kinnear Co.,* 103 Va. 719, 724, 49 S.E. 988, 990 (1905). As we have already pointed out during the analysis of the report, defendant at all times had been diagnosed as a schizophrenic. On occasion his condition was acute but most of the time he was in a chronic state. Based in part on defend-

ant's post-crime admission to Central State on August 18, 1978, as outlined in the sixth paragraph of the report, defendant's diagnosis "remain[ed] one of chronic schizophrenia," as set forth in the seventh paragraph. Such a judgment by Dimitris was reached after, not before, defendant had, as early as February of 1977, been diagnosed as a schizophrenic "chronic, undifferentiated type." This does not demonstrate prejudgment or predisposition by Dimitris to the ultimate opinion. Rather, the facts show that thorough and frequent evaluations of defendant's mental health by the staff of Central State generated the same diagnosis that Dimitris expressed in the report in issue. At the worst, the physician merely used colloquial expressions in the ninth paragraph to enliven an otherwise dry medical report. Consequently, we hold the trial court did not abuse its discretion in refusing use of the report for purposes of impeachment.

## IV.

Finally, defendant contends the trial court erred in refusing three of his proffered instructions. One instruction provided that the Commonwealth had the burden to prove penetration as an element of rape. Another stated the absence of semen was a "strong circumstance indicating that there was no sexual intercourse." Neither of these instructions was proper under the evidence. The victim testified that penetration occurred and the defendant admitted in his post-arrest statement that he "made love" to the victim. The penetration testimony was uncontradicted, so the instructions were unnecessary and not applicable to the facts of the case. There was no evidence in controversy on that point of fact and the jury was otherwise properly instructed on the essential elements of the crime.

The third refused instruction set forth the detailed administrative procedures to be followed by the court and the Commissioner of Mental Health and Mental Retardation under Code § 19.2-181 when a defendant is acquitted by reason of insanity. In *Rollins* v. *Commonwealth*, 207 Va. 575, 151 S.E.2d 622 (1966), *cert. denied*, 386 U.S. 1026 (1967), we said similar language in a tendered instruction was properly excluded because the statutory requirements were directed "to the court and [were] not the concern of the jury." 207 Va. at 583, 151 S.E.2d at 627. We adhere to that view as applied to the instruction in this case.

For all of the foregoing reasons, we find no error in the judgments of conviction and they will be severally

*Affirmed.*