# Fairfax Hospital System, Inc.

## v.

## Patricia Curtis, as Administrator for the Estate of Jessie Curtis, Deceased, et al.

Record No. 940992

April 21, 1995

Present: All the Justices

*Gary W. Brown (William L. Carey; Miles & Stockbridge*, on briefs), for appellant.
*Philip J. Hirschkop (David J. McClure; Hirschkop & Associates*, on brief), for appellees.

JUSTICE HASSELL delivered the opinion of the Court.

In this appeal of a judgment in a medical malpractice action, we consider the admissibility of certain expert testimony and the opinion of a medical malpractice review panel.

Patricia Curtis, administrator of the estate of Jessie Curtis, filed a notice of claim, pursuant to former Code § 8.01-581.2, against Fairfax Hospital System, Inc. (Hospital) and certain other health care providers. The health care providers requested a medical malpractice review panel. The panel conducted a hearing and held that the evidence did not support a conclusion that the health care providers failed to comply with the appropriate standard of care. Subsequently, the administrator filed this action against Fairfax Hospital and its nurse, Linda S. Beckett, seeking damages for their alleged negligence. The administrator non-suited her claims against Beckett, and the jury returned a verdict in favor of the administrator. We awarded the Hospital an appeal.

In accordance with well-settled principles, we will review the evidence and all reasonable inferences therefrom in favor of the administrator, the recipient of a favorable verdict confirmed by the trial court. Patricia Curtis, a patient at Fairfax Hospital, gave birth to Jessie on February 13, 1989. Jessie had Apgar scores of

eight and nine, and her neurological examination was normal. Even though Jessie's birth was uneventful, she was placed in the neonatal intensive care unit and attached to an apnea monitor because she was born to a diabetic mother and, therefore, was at risk for hypoglycemia.

Jessie was monitored closely and once it was determined that her blood sugar level remained within the normal range, she was scheduled for discharge from the Hospital on February 16, 1989, after she had a renal sonogram. The sonogram was not performed as scheduled and, therefore, Jessie was not discharged that day. Dr. Daniele F. Huntington, a neonatologist, authorized the Hospital staff to remove Jessie's apnea monitor because she was no longer at risk for hypoglycemia.

Beckett began her nursing shift at the Hospital's neonatal intensive care unit at 7:00 a.m. on February 17, 1989. Beckett was responsible for four babies, including Jessie. Susan P. Fahey, who was also a nurse at Fairfax Hospital's neonatal intensive care unit, informed Beckett that Jessie should be fed by 8:00 a.m. Jessie apparently had been swaddled in blankets and placed on her stomach about 4:00 a.m. that morning and remained in that position for about five hours. When Beckett began her shift, Jessie was screaming, but no one checked her. Jessie was also "grunting off and on," but Beckett did not "suspect anything wrong."

Sometime after 7:30 a.m., Beckett attended two infants who were seriously ill. She then left the neonatal intensive care unit room to go to the restroom and also to get the necessary equipment to transport Jessie to another area of the hospital where her sonogram would be performed.

Beckett remained out of the room for about six to eight minutes. She returned and checked Jessie about 8:48 a.m. Beckett "flipped her over" and found her in full cardiopulmonary arrest. Jessie was lying "face down, pushed in." Her face was "sort of mashed down" and her "nose [was] flattened" and blue. Dr. Tong Soo Park, a neonatologist who had treated Jessie before her cardiopulmonary arrest, testified that Jessie was in cardiopulmonary arrest for at least 10 to 15 minutes and perhaps as much as 40 minutes.

Beckett, Carol Ann Awad (another nurse in the neonatal intensive care unit), and certain other health care providers, including Dr. Janet K. Hilliard, a neonatologist, were able to resuscitate Jessie. Later that day, Dr. Hilliard told Patricia Curtis and her

father, Carle William Curtis, that Jessie had suffocated in her blankets, and "[s]he was found laying flat on her face and she had a blanket over her face."

The administrator's expert witnesses testified that Beckett failed to comply with the applicable standards of care and that her failure to comply with these standards was a proximate cause of Jessie's extensive brain damage that subsequently caused her death four months later. Dr. Hilliard, as well as the administrator's expert witnesses, testified that Jessie's blood arterial gases measured at 9:02 a.m. and 9:09 a.m. on the morning of her cardiopulmonary arrest were consistent with a 15 to 40-minute oxygen deprivation. The administrator's expert witnesses also opined that Jessie suffocated because she had been left "face down" on the mattress, and that she had not been properly monitored in the neonatal intensive care unit.

The trial court permitted the Hospital's expert witnesses to testify that Jessie's death was a near-Sudden Infant Death Syndrome (SIDS) event. According to their testimony, a near-SIDS event is an exclusionary medical diagnosis which is rendered when health care providers are unable to attribute an infant's life-threatening event to any other medical reason. The Hospital's expert witnesses testified that either SIDS or a near-SIDS event may be significantly increased by certain factors, "including maternal smoking, seizures of the mother during pregnancy, trauma, and poor diabetes control."

The Hospital argues the trial court erroneously refused to allow any evidence before the jury that the aforementioned SIDS risk factors identified by their expert witnesses were present in Patricia Curtis' prenatal history. The Hospital says that the trial court "prevented the defense from presenting the necessary evidentiary underpinning of its primary theory — that because of the cumulative effect of repeated *in utero* insults, the infant suffered from a neurologically induced developmental defect in the brainstem response and arousal mechanisms, resulting in a failure to arouse from a normal apneic episode leading directly to the cardiopulmonary arrest." The administrator, however, contends that the trial court did permit the Hospital to present evidence of certain risk factors associated with a near-SIDS event. The administrator also asserts that the trial court properly excluded certain expert testimony because the Hospital's expert witnesses could not say within a reasonable degree of medical probability that certain factors

associated with a near-SIDS event specifically caused Jessie's cardiopulmonary arrest.

We agree with the administrator. In *Spruill v. Commonwealth*, 221 Va. 475, 271 S.E.2d 419 (1980), which the administrator discusses in her brief and the Hospital ignores, we discussed the parameters governing the admissibility of expert testimony. In *Spruill*, the defendant's mental condition was at issue. The defendant's psychiatrist was asked during direct examination whether the defendant had the capacity to appreciate the nature and consequences of any criminal acts that he may have committed. The Commonwealth objected, and the psychiatrist was examined out of the presence of the jury.

The defendant's counsel asked the psychiatrist whether on the day of the crimes defendant "was suffering from such mental disease or defect that he lacked substantial capacity either to accept the responsibility of his conduct or conform his conduct to the requirements of the law?" The psychiatrist responded, "[w]ell, I couldn't say." Defendant's counsel then asked the psychiatrist whether there was a "possibility" the defendant was insane on the day he committed the crimes, and the psychiatrist responded, "[i]t's a possibility, yes." The trial court refused to admit the testimony on the basis that the psychiatrist's response was "purely speculative." The trial court stated, "[the physician] didn't say he was insane. He said it was a possibility, but that he couldn't say." *Id.* at 479, 271 S.E.2d at 421.

■ Approving the trial court's refusal to admit that evidence, we stated:

A medical opinion based on a "possibility" is irrelevant, purely speculative and, hence, inadmissible. In order for such testimony to become relevant, it must be brought out of the realm of speculation and into the realm of reasonable probability; the law in this area deals in "probabilities" and not "possibilities."

*Id.*

■ Here, the trial court permitted the Hospital to present evidence to the jury that Patricia Curtis experienced seizures during her pregnancy, that she was a Class D diabetic, that she had smoked cigarettes during her pregnancy, and that she had a difficult time controlling her diabetes during the pregnancy. The trial

court also permitted the Hospital's expert witnesses to testify that each of the aforementioned facts generally is a risk factor associated with a near-SIDS event. The trial court, however, refused to permit the Hospital's expert witnesses to opine that there was a *possibility* that these factors may have caused Jessie's cardiopulmonary arrest. The Hospital conceded in the trial court and at the bar of this Court that none of its expert witnesses could testify within a reasonable degree of medical probability that Jessie's cardiopulmonary arrest was proximately caused by any of these factors.

 Our review of the record reveals that, at best, the Hospital's proffered expert witnesses could show only a generalized and insignificant statistical correlation between an infant's increased risk of SIDS or a near-SIDS event and the aforementioned risk factors. None of the Hospital's expert witnesses could testify that any of these selective factors — the mother's history of diabetes, prenatal trauma, seizures, or smoking — specifically caused Jessie's cardiopulmonary arrest. The failure of the Hospital's expert witnesses to associate these specific factors to Jessie's cardiopulmonary arrest and subsequent death rendered these factors speculative. Therefore, the testimony of these witnesses was not admissible because that evidence was predicated upon insignificant statistical possibilities and, as we said in *Spruill*, the law in this area deals with probabilities, not possibilities.

Next, the Hospital argues that the trial court erred in excluding the expert testimony of Dr. Thomas A. Massaro on the issue of the standard of care applicable in an intensive care unit in Virginia at the time of Jessie's death. The Hospital points out that Dr. Massaro, a professor of pediatrics, was medical director of the pediatric intensive care unit at the University of Virginia for nine years, until 1987.

The Hospital asserts that during *voir dire*, Dr. Massaro testified that he was familiar with the standard of care applicable to babies treated in neonatal intensive care units and well baby nurseries in Virginia in February of 1989. The administrator argues that the trial court properly excluded Dr. Massaro's proffered testimony on the standard of care in an intensive care unit in Virginia because he failed to maintain an active clinical practice in this field of medicine or a related field within one year of the date of the alleged medical malpractice as required by Code § 8.01-581.20.

We agree with the administrator. Code § 8.01-581.20 states in relevant part:

An expert witness who is familiar with the statewide standard of care shall not have his testimony excluded on the ground that he does not practice in this Commonwealth. A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.

■ Dr. Massaro testified that he practiced as "an active attending physician until about two years prior to [Jessie's cardiopulmonary arrest] and practiced in . . . a very similar unit right across the way, but I was not active at that time." At the time of Jessie's cardiopulmonary arrest, Dr. Massaro was the director of a helicopter transport service which transported sick and injured patients. Certainly, his tenure in this capacity cannot be deemed an active clinical practice within the contemplation of Code § 8.01-581.20. The trial court properly excluded Dr. Massaro's testimony on the standard of care because he did not have an active clinical practice in the Hospital's specialty. In this instance, that specialty is ·the provision of nursing care to babies in a neonatal intensive care unit or a related field of medicine, within the statutorily required period of one year of the date of Jessie's cardiopulmonary arrest. Code § 8.01-581.20.*

We now consider the admissibility of the opinion of the medical malpractice review panel. The administrator filed her notice of claim on March 1, 1990. A review panel was requested, and the panel was designated on May 24, 1990. A hearing date was scheduled for November 1990. Counsel for the Hospital requested a continuance, and the administrator agreed to the extension. A new

---

* Code § 8.01-581.20, which permits a court to qualify a doctor as an expert witness on the applicable standard of care, states in relevant part: "Any physician who is licensed to practice in Virginia shall be presumed to know the statewide standard of care in the specialty or field of medicine in which he is qualified and certified." The Hospital does not argue and, therefore, we do not consider whether the trial court abused its discretion by excluding Dr. Massaro's expert testimony under this provision of the statute.

hearing date was scheduled for February 1991. Counsel for other health care providers requested a continuance in August 1990, and the panel hearing date was continued by agreement of all parties, including the Hospital, to April 9, 1991.

On March 15, and again on March 22, 1991, counsel for the administrator sent a letter to the chairman of the medical malpractice panel, alleging that counsel for the health care providers had refused to comply with discovery. On March 26, 1991, the chairman unilaterally decided to cancel the April 1991 hearing date, without agreement of counsel. The chairman continued the hearing date to September 23, 1991. The panel rendered its opinion on September 23, 1991.

During the proceedings before the medical malpractice review panel, the administrator asserted that she believed that any opinion rendered by the panel would not be admissible in a later trial because the opinion was not rendered timely. Subsequently, the Hospital filed a motion requesting that the panel chairman enter an order "certifying [the] admissibility of panel opinion." The Hospital asserted in its motion that:

> In apparent response to [the administrator's] letter of March 15, 1991, the [chairman] on March 26, 1991 *sua sponte* canceled the panel hearing date of April 9, 1991 and extended the discovery deadline to April 30, 1991. The date for a new panel hearing was left open.

> The Health Care Providers never received the opportunity to be heard as to whether the April 9, 1991 panel hearing date should be postponed.

In February 1992, about five months after the panel had rendered its opinion, the chairman of the panel entered an order stating that all the continuances were by agreement of counsel and that, "if [c]laimant's counsel had, in fact, raised any objection to either the extension of discovery or the rescheduling of the hearing until September 23, 1991, then the Panel Chair would have rescinded the discovery extension and proceeded with the hearing on April 9, 1991, as previously scheduled."

At trial, the Hospital sought to introduce the opinion of the medical malpractice review panel. As we have previously stated, the medical malpractice review panel concluded that the evidence did not support a finding that the Hospital breached the standard

of care owed to Jessie on February 17, 1989. The administrator objected to the admission of the panel's opinion on the basis that Code § 8.01-581.7:1 rendered the opinion inadmissible because it was not rendered timely. The trial court agreed with the administrator and refused to admit the opinion.

Former Code § 8.01-581.7:1 states:

> *Unless the parties otherwise agree,* any opinion of the panel shall be rendered no later than six months from the designation of the panel unless the chairman shall extend the period one time, not to exceed ninety days, upon a showing of extraordinary circumstances. If the opinion of the panel is not rendered within the time provided, the claimant shall be free to pursue his common-law remedies and *any panel opinion rendered subsequently shall be inadmissible as evidence unless the failure of the panel to render a decision within the time provided was caused by delay on the claimant's part.*

(Emphasis added).

██ We hold that the trial court did not err by excluding the opinion of the medical malpractice review panel. The litigants do not dispute the fact that the review panel rendered its opinion more than six months from the date of the designation of the panel. Applying the plain meaning of the language in Code § 8.01-581.7:1, the panel was required to render its opinion no later than six months from the designation of the panel unless the parties otherwise agreed. The record is clear that the administrator did not agree to a continuance of the April 9, 1991 hearing date. Furthermore, the Hospital, in its own motion filed before the medical malpractice review panel, stated that the chairman "*sua sponte* canceled the panel hearing date of April 9, 1991." We will not permit the Hospital to argue before the review panel that the continuance was granted *sua sponte* and then assert here that the continuance was by agreement of counsel.

Finding no error in the judgment appealed from, we will affirm the judgment of the trial court.

*Affirmed.*