COURT OF APPEALS OF VIRGINIA


Present:  Judges Elder, Lemons and Senior Judge Cole
Argued at Richmond, Virginia


MONTE M. PERKINS

                                   MEMORANDUM OPINION* BY
v.    Record No. 1839-98-2          JUDGE MARVIN F. COLE
                                       JANUARY 27, 2000
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    James B. Wilkinson, Judge

          Maureen L. White for appellant.

          Jeffrey S. Shapiro, Assistant Attorney
          General (Mark L. Earley, Attorney General;
          Daniel J. Munroe, Assistant Attorney General,
          on brief), for appellee.


     Appellant was convicted in a jury trial of first degree

murder and use of a firearm in the commission of murder.  On

appeal, appellant contends that the trial court erred:  (1) by

refusing to admit into evidence a videotape of Detective Simmons'

interview with Shamal Benjamin, a codefendant, and (2) by failing

to strike the evidence on the charge of first degree murder

because the evidence was insufficient as a matter of law to

sustain a finding of guilt.  We disagree and affirm.



        * Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

FACTS

"On appeal, we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom." Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987).

In the fall of 1997, Shamal L. Benjamin was released from boot camp. He testified on behalf of the Commonwealth that when he returned home, he had problems at school with two youths, Wayne Martin and Matthew Jones. In explaining the trouble, Benjamin said, "[t]hey were going around saying that I had robbed them." Generally, he said that they "harassed, beat up and banked" him. Benjamin testified that he reported these incidents to his probation officer and the school authorities. This trouble would stop for a short time and then resume.

Prior to the October 25, 1997 shooting, Benjamin had discussed his difficulties with two friends, Dominique Waller and Rasheen Waller, who were appellant's cousins. The Wallers told Benjamin that "[t]hey were going to handle it." On the morning of October 25, 1997, Benjamin received a phone call from appellant and Rasheen Waller. Appellant said he had a red Taurus car and that he would be around later in the day to pick up Benjamin. Later in the day, appellant, his stepbrother William Culpepper, Dominique Waller and Rasheen Waller arrived at Benjamin's home. Appellant said to Benjamin that "he had heard what was going on with the problems I was having at school." Appellant also said,

-

"we're going to handle that."  Benjamin further testified that they walked to the Dominique Waller and Rasheen Waller house, located in the San Souci Apartments.

All five of them got in the red Taurus.  At first, Rasheen Waller was driving and Benjamin was in the passenger seat.  Appellant was in the back seat behind the driver; Culpepper was in the rear middle seat; Dominique Waller was in the other rear seat.  According to Benjamin's testimony, they "rode around for a little while, back and forth."  Eventually, they came back to where they had started and dropped off Dominique Waller.  At this point, Benjamin started driving the car.  They went through Deering Manor Apartments because Martin and Jones lived there.  Benjamin told appellant he wanted to drive through there "to see was . . . Martin and . . . Jones out there."  Benjamin testified that he saw only Martin, but he also saw some "boys" he had never seen before.

Benjamin testified that appellant said "let's go back to San Souci and get the gun."  They drove back to the San Souci Apartments and parked in the back of Dominique Waller's house.  Rasheen Waller and appellant got out of the car and went inside.  Benjamin and Culpepper stayed in the car.  Benjamin and Culpepper were called in the house and everybody went inside Dominique Waller's house.  Benjamin explained what occurred there as follows:

> So, everybody went in the house.  The gun
> was brought out.  It had the clip and
> everything in it.  So, Dominique Waller was

-

like y'all do it another time, don't even go around there, wait later. So, Rasheen Waller and [appellant] was like, no, we're going to do this now and get it over with.

In response to a question, Benjamin testified that Dominique Waller "went and got the gun." After this discussion, they got back in the red Taurus. Appellant was the driver; Rasheen Waller was in the front passenger seat; Benjamin was in the back seat behind the driver; Culpepper was in the back seat behind the front passenger seat. Benjamin had the gun, an AK-47, in his hands. They left the San Souci Apartments and returned to the Deering Manor Apartments. By this time it was dark, Benjamin told the others that he would direct the driver how to get to Deering Manor Apartments, how to get in, and how to get out. Appellant followed Benjamin's instructions in and out.

As the group approached the area in which they had seen Martin earlier, appellant stopped the car and waited for a nearby car to drive away. Once that car had left, appellant pulled up and stopped the car. Benjamin then jumped out and "started shooting." Benjamin jumped or was pulled back into the car. Appellant drove from the scene according to instructions from Benjamin and returned to Dominique Waller's house in the San Souci Apartments. The gun was returned to Dominique Waller. The police found ten cartridges at the crime scene. Daryl Pettiford was shot in the chest and died later that night.

-

At the conclusion of the Commonwealth's evidence, appellant moved to strike the evidence because "the Commonwealth has proven no more than mere presence here" and that the testimony of Benjamin was incredible. The trial judge denied the motion stating that, "it's a jury question." The same motion was renewed at the conclusion of all the evidence and was likewise denied.

The jury found appellant guilty of first degree murder and guilty of use of a firearm in the commission of murder. The Court convicted him accordingly.

## I. ADMISSION OF THE VIDEOTAPE

At trial, the Commonwealth put on its evidence, which included the testimony of Benjamin. It then rested its case.

The trial judge called upon appellant to present his defense. After appellant made a motion to strike the evidence, the following discussion took place between the judge and defense counsel while the jury was out:

> [DEFENSE COUNSEL]: Your Honor, the only evidence we would like to present is the tape of Shamal Benjamin in his interview with the police.
>
> THE COURT: I think that it would have to go to impeachment. I don't know what's impeachable and what's not impeachable [in the tape].
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> THE COURT: Well, where is the detective?

-

[COMMONWEALTH'S ATTORNEY]:  The detective is here.  He has been sequestered.

THE COURT:  Call him to ask a specific question, did he tell you so and so on such and such a date?

[COMMONWEALTH'S ATTORNEY]:  Detective Simmons is right back there.

THE COURT:  I mean, if you want to call him.

 *      *      *      *      *      *      *

THE COURT:  What point do you intend to impeach?

[DEFENSE COUNSEL]:  Your Honor, I have got it here.  In the tape he testified, he told the police -- first he told the police the red Taurus had been there earlier and a crowd of people had been there and he was in there with four people.  Then he said that he was hanging out with these guys.  Monte Perkins and Rasheen left and during that period of time a blue Cavalier with these two guys he is beefing with came around.  It was only at that time that he had the idea to get the gun.  And, it was at that time --

THE COURT:  Well, how did that impeach him?  Excuse me just a minute.  You want to impeach the Commonwealth's witness.  You have asked him did he interview with the detective.  You might have laid a proper foundation.  I am going to give you the benefit of the doubt, but I don't think you did.  You must give time, place, and circumstances.  He is interviewed by the police.  Now, you can ask specific questions did he tell you at that time this, did he tell you that, did he tell you this, and then the officer will answer whatever the answer will be.  But, you just can't take the tape because there's probably a lot of inadmissible evidence in the tape.

 *      *      *      *      *      *      *

-

[DEFENSE COUNSEL]: Well, I think, you Honor, we're entitled to introduce prior inconsistent statements.

THE COURT: I'm not arguing [on that point]. I'm just telling you how to do it . . . . That's all I'm doing.

\* \* \* \* \* \* \*

[COMMONWEALTH'S ATTORNEY]: The tape is almost 45 minutes long, Judge.

THE COURT: That's not the point. The point is some of it is admissible, some of it isn't. The only thing that's admissible to impeach your witness, that's prior inconsistent statements. . . .

[DEFENSE COUNSEL]: Your Honor, I think the whole tape is inconsistent with his testimony today. That's the point.

[COMMONWEALTH'S ATTORNEY]: That's entirely untrue, entirely.

[DEFENSE COUNSEL]: I don't think it is. But, that is the point and that's why I'm offering --

THE COURT: I am not going to let the whole tape in. If you want to call the officer.

[DEFENSE COUNSEL]: Yes, sir. I call Detective Simmons.

THE COURT: All right. Return the jury.

Appellant called Simmons as a witness and questioned him about any prior inconsistent statements made by Benjamin. Simmons testified that he interviewed Benjamin on November 15, 1997, regarding the events that occurred on October 25, 1997. The trial court permitted defense counsel to extensively question Simmons concerning the interview with Benjamin and any

-

inconsistent statements made by Benjamin.  After the testimony of Simmons was concluded, appellant rested his case.

Appellant again renewed his request to admit into evidence the entire videotape and have the jury see it.  The motion was overruled.  Appellant moved that the videotape be made part of the record.  This motion was granted.

Appellant contends that the trial court erred in refusing to allow him to introduce the videotape containing prior inconsistent statements made by Benjamin.  He argues that this refusal violated his Sixth Amendment right to confront the witnesses and to present evidence in his defense.  He claims it also violated the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution.  Additionally, he argues that the admission of the tape would have enabled the jury to compare the demeanor of Benjamin at trial and his demeanor during the interview.  Since we find the videotape inadmissible, we do not address this issue.

"A witness may be impeached by showing that he has formerly made statements inconsistent with his present testimony."  1 Charles E. Friend, The Law of Evidence in Virginia § 4-3(a) (4th ed. 1993).  "[P]rior inconsistent statements are admitted solely to attack the credibility of the witness who has told different stories at different times."  Id.  "If a witness gives testimony that is inconsistent with a prior statement, or testifies that he does not recall making the prior statement, a sufficient

-

foundation for impeachment has been laid, and opposing counsel may cross-examine the witness as to the inconsistency." Smith v. Commonwealth, 15 Va. App. 507, 511, 425 S.E.2d 95, 98 (1992) (citation omitted) (holding that there was no Sixth Amendment violation when trial court failed to admit the transcript of a witness' prior statement after the witness admitted that his prior statement was inconsistent with his trial testimony). Counsel must call the witness' attention to the circumstances of the particular occasion on which the alleged prior statement was made. See Waller v. Commonwealth, 22 Va. App. 53, 58, 467 S.E.2d 844, 847 (1996) (citation omitted); see Code § 8.01-403. The witness must be asked whether he previously made a particular statement, "[i]f the witness denies or is unable to recall having made the statement, counsel must then prove the statement actually was made." Patterson v. Commonwealth, 222 Va. 612, 616-17, 283 S.E.2d 190, 193 (1981).

"Although it is proper under Virginia law to use a witness' prior inconsistent statement for impeachment purposes, the trial court has some discretion in determining how such a statement shall be used." Smith, 15 Va. App. at 510-11, 425 S.E.2d at 98. "[T]he extent of testimonial impeachment . . . should be 'left largely to the sound discretion of the trial court; and the rule is well established that an appellate court will not interfere, unless that discretion has been plainly abused.'" Spruill v.

-

Commonwealth, 221 Va. 475, 485, 271 S.E.2d 419, 425 (1980) (citation omitted).

The record reflects that Benjamin was called as a Commonwealth's witness and on direct examination testified extensively about the appellant's involvement in the shooting. He admitted that he shot the victim. Appellant did not object to any of his testimony.

Upon completion of the direct examination, appellant fully cross-examined Benjamin about all of his actions that occurred on October 25, 1997. The cross-examination takes up twenty-one pages in the sixty-page transcript of the proceeding. Although some mention was made about an interview with Simmons and two other officers, there was no suggestion that a videotape was made of the interview. During the cross-examination, appellant did not call Benjamin's attention to any statements that were inconsistent with the videotaped police interview.

Appellant, by proffering the entire videotaped statement at the conclusion of the Commonwealth's case, and after he had completed his cross-examination of the witness, did not proceed properly in attempting to use the videotape to impeach Benjamin's trial testimony. The trial court permitted appellant to extensively question Simmons concerning his interview with Benjamin and any inconsistent statements made by Benjamin.

Moreover, we have reviewed the transcription of the videotape, which was made part of the record upon appellant's

-

motion.  Those present at the interview held on November 15, 1997, were Detective J.A. Simmons and Detective King of the Richmond Police Department and Detective Carroll of the Chesterfield County Police Department.  No explanation was given for the presence of the Chesterfield officer.  However, as the interview progressed, it became obvious that Benjamin was in the custody of the Chesterfield police.  Simmons asked Benjamin, "Even after the shooting, what are you doing out here in Chesterfield shooting up people?"  Benjamin responded, "This time we was – this is self-defense.  This is self-defense."  In response to a question from King, Benjamin stated, "I know we had an AK last night, but that wasn't the weapon.  That weapon that we got last night, that was somebody else's weapon."  The interview ended with Simmons thanking Benjamin for his "honesty" and King expressing his appreciation to Benjamin for "telling us the truth."

Much of the interview was concerned with problems that existed between Benjamin and other persons in his school that had little if any relevance to this case.  The videotape contains much duplication.  Very few dates and times of day are included in the interview, making it impossible to determine what occurred on October 25, 1997, and what took place on other occasions.  We find that Benjamin's testimony at trial and his statements to the police were substantially the same.  Therefore, the trial judge did not abuse his discretion in refusing to admit the videotape in

-

evidence and did not violate appellant's right to confront the witnesses and present evidence in his defense.

## II.  SUFFICIENCY OF EVIDENCE

Appellant contends that the Commonwealth elicited evidence that appellant was at home with his mother at the time of the shooting and that there was a reasonable hypothesis that he was mistakenly identified.  Appellant asserts that "Howard based her identification of [appellant] on the information related to her by the police and not on her recollection of his face."

The record provides no mention of any person named "Howard," and the record is devoid of any evidence that appellant was anywhere but driving the car.  Furthermore, appellant's statement of facts provides that the "undisputed facts establish that on October 25, 1998 [sic], Shamal Benjamin got out of a car driven by [appellant] . . . ."  The Commonwealth's evidence was competent, was not inherently incredible, and was sufficient to prove beyond a reasonable doubt that appellant was guilty of first degree murder and use of a firearm in the commission of murder.

For the foregoing reasons, we affirm the convictions.

<u>Affirmed</u>.