PRESENT: All the Justices

VICKIE M. PARSON, INDIVIDUALLY, ET AL.

OPINION BY
v. Record No. 171393      CHIEF JUSTICE DONALD W. LEMONS
DECEMBER 20, 2018

DENEEN L. MILLER

FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
Victor V. Ludwig, Judge

In this appeal of a judgment in a will contest, we consider whether the trial court erred in refusing to grant the defendant's motion to strike the evidence and by holding that the evidence was sufficient as a matter of law to support the jury's verdict that the will was the result of undue influence.

I.  Facts and Proceedings

A.  The Complaint

In December 2014, Deneen L. Miller ("Miller") filed an amended complaint in the Circuit Court of Augusta County ("trial court") against Vickie M. Parson ("Parson"), individually and as executor of the estate of Kenneth Cyrus Coffey ("Coffey"), and against Coffey's heirs. According to the complaint, Coffey, who was Miller's father, executed a new will on July 15, 2013, shortly before his death on July 22, 2013 (the "2013 will"). The 2013 will, which was attached as an exhibit, identified Parson, Coffey's niece, as the beneficiary of Coffey's residuary estate. The 2013 will also appointed Parson as executor and contained no other dispositions or gifts. The complaint sought to impeach the 2013 will on the grounds of lack of testamentary capacity (count I), and undue influence (count II).

B.  Miller's Evidence

The matter proceeded to a two-day jury trial.  Miller testified at trial that Coffey was her father and he was 80 years old when he died.  Coffey had lived in Lyndhurst, Virginia, on a large parcel of property.  Parson, Coffey's niece, lived on an adjoining parcel of property.  Miller had lived at Coffey's home as a young child, but she and her mother had moved away when she was 11 years old.  Miller and Coffey reconnected when Miller was 14 years old, and Miller testified that she maintained a close relationship with him from that point on.  Miller testified that since she was 18 years old, Coffey had wanted her to come and live with him.  However, Miller continued to live in Winchester, approximately two hours away from Coffey.  Miller further testified that Coffey also told her "that one day he wasn't going to be there and that everything was to be given to me."  The last time Miller recalled Coffey making a statement about leaving her everything was in April or May of 2013.  Miller stated that during this discussion, Coffey also showed Miller where he kept his important documents, including his will.  However, Miller admitted that she never actually saw the contents of the will.

Miller testified that Coffey was first admitted to the hospital in May 2013.  She admitted that she did not visit him during that first hospital stay.  He was admitted to the hospital again on June 6, 2013, and was released around June 18, 2013.  Although Coffey was able to come home, he was only expected to live for a few months and was placed in hospice care.  Miller testified that she assisted Coffey by giving him medications, preparing his meals, and making him comfortable.  However, she admitted that she did not visit every week in June and July of 2013.  Miller testified that during her visits in June, she observed Coffey have at least two hallucinations, and she told the hospice workers about them.  Miller also admitted that Coffey wanted her to move in with him, but she did not do so.

Miller acknowledged that Parson was also helping Coffey during his illness. When Miller first learned that Parson was helping to care for Coffey, Miller testified that "I thought she was a blessing and I thanked her." However, Miller testified that Coffey was not happy about Parson helping him. Miller stated that Coffey "was upset that [Parson] signed [the hospice agreement] because he did not want [Parson] in the house at all." Miller also testified that Coffey was upset on another one of her visits because "[Parson] had just came in and offered that she wanted to purchase the property from him, her and her husband Jack Parson, and he was angry."

Miller testified that the last time she visited her father was on July 6, 2013. She was not able to reach him by telephone after that date. Parson informed Miller that Coffey was upset with Miller and did not want her there. Miller wrote Coffey a letter around July 18 or 19, in which she stated that she wished she knew why Coffey was angry with her, and why "you've turned your heart from me." She also apologized to Coffey for not being with him but explained that she lived 125 miles away. Miller testified that she was unaware of Coffey's mental state when he signed the 2013 will, but she believed Parson manipulated Coffey and gained control over him. Miller stated, "I think she manipulated him. I think she put things in his head. I think she worked her way into my dad's house when I was not there." But when asked what specifically Parson did to gain control of Coffey, Miller replied, "I don't know."

Miller testified that the first time she learned of Coffey's 2013 will was on the day he died. Parson called Miller to tell her Coffey had died, and that Coffey had left everything he owned to Parson. Miller testified that the next day she drove to Coffey's house to look for Coffey's will and other important papers, but the locks had been changed. Miller then went to

Parson's house, and Parson handed her a bag with some items that belonged to Miller and told Miller not to go onto Coffey's property or Parson would have her arrested.

Shawn Coffey, Miller's brother and one of Coffey's sons, testified that Coffey had previously told him that Coffey intended "to leave everything" to Miller. Shawn testified that he visited his father twice in the hospital in June 2013. During one visit, Coffey stated that he did not know why Miller kept driving back and forth because Coffey's house "was going to be hers and he didn't know why she didn't – she didn't go there and stay." Shawn testified that during this conversation Coffey was "strong-headed" but he was physically weak. Shawn admitted, however, that during his visits, Coffey never mentioned his will. The last time Shawn spoke to Coffey was June 16, 2013. Shawn admitted that he had no knowledge regarding Coffey's state of mind during the last month of his life, or whether anyone exerted influence over him.

Catherine Harvey, a close friend of Miller's, testified that she often spent time with Miller and Coffey. During those visits, Coffey mentioned that he wanted Miller to move down to live with him, because the house and property were "going to her eventually anyway." Harvey also testified that on several occasions she saw Coffey take out a brown package that held his will, and that on one visit, he read a paragraph from the will out loud.

Mary Wymer, Miller's former sister-in-law and friend, testified that she visited Coffey's house with Miller on several occasions. Wymer described Coffey as someone who was "very forward" and "said what he thought." She had visited Coffey in the hospital in June 2013, and testified that he was upset when she arrived. Parson had just been to see him and asked about buying his property, which had upset Coffey. According to Wymer, Coffey "told them he wasn't going to sell his property, that he was going to leave it to [Miller]." Wymer testified that she had heard Coffey say something similar on previous occasions about wanting Miller to have his

4

house.  Wymer admitted that she did not see Coffey in the two weeks prior to his death, and she never spoke to him in July 2013 about his will.

Miller called Parson to testify as an adverse witness.  Parson testified that she had lived down the street from Coffey for more than 20 years, but she had only come to know him well in the last two years of his life.  Parson admitted that she purchased a will kit for Coffey in June 2013, at his request.  The 2013 will was signed by her sister, Lisa Shaw, and her son-in-law, Keven Brenneman.  Parson, however, did not prepare the 2013 will.  Parson admitted that Coffey was a rather difficult person to be around.  She testified that he was a very particular person who "liked things his way."

At this point in the trial, Miller rested.  Parson then made a motion to strike both counts.  The trial court granted the motion to strike with respect to count I (testamentary capacity), but denied the motion as to count II (undue influence).

## C.  Parson's Evidence

Parson's first witness was Kevin Brenneman.  He testified that Parson was his mother-in-law.  Brenneman stated that he had known Coffey for four years and described Coffey as "very set in his ways."  On July 4, 2013, Coffey asked if Brenneman would do him a favor, that Coffey had something he wanted Brenneman to sign.  On July 13, 2013, Brenneman was visiting Coffey again and Coffey said that "the date was set to sign and we were going to sign it on the 15th." Brenneman testified that Coffey made these arrangements, not Parson.  At no time did Parson ask Brenneman to do this.  Parson was also not present on July 15, 2013, when the 2013 will was signed. The other people present when the 2013 will was signed, in addition to Coffey and Brenneman, were Lisa Shaw, Brenneman's wife, Brenneman's wife's grandmother, and Brenneman's wife's aunt.  Brenneman testified that when the 2013 will was signed, Coffey was

5

directing everyone. No one told Coffey to sign the 2013 will. The 2013 will was not read aloud, and Coffey did not tell them the terms of the 2013 will. Brenneman did not know who had prepared the 2013 will. The other witness who signed the 2013 will was Lisa Shaw, but she did not testify at trial.

Paul Gunick, who was a close friend of Coffey's for over 30 years, testified that he visited Coffey every day while he was sick, except for the last two weeks of Coffey's life when Gunick was out of town. But Gunick spoke to Coffey on the phone every day during the last two weeks. Gunick saw Miller at Coffey's house one time during his visits when Coffey was sick. Miller was outside smoking with a friend, and Gunick testified that Coffey was upset that they wouldn't come in the house. Gunick testified that during one of his visits he asked Coffey if he had a will, and Coffey responded that he did not. Gunick told Coffey he needed to make one. Gunick testified that Coffey wanted Miller to come stay with him and take care of him but Miller would not do so. Coffey also told Gunick that if he left his house to Miller, she was just going to sell it and he wanted the property to stay in the family.

Gunick testified that Parson and her husband Jack were always at Coffey's house in the last couple months of his life. Parson would feed Coffey and take care of him. Gunick testified that Coffey was difficult to take care of. But when Coffey had visitors, Parson would leave them alone with Coffey. Gunick stated that even in the last month when he was sick, Coffey "had a mind of his own. He did what he wanted," and he was not submissive in any way.

Ed Cox, Parson's brother and Coffey's nephew, testified that he had known Coffey his "entire life." He described Coffey as "one of a kind," and someone who was "very decisive" and "meticulous." Cox testified that he visited Coffey several times in June and July before Coffey died. During one of those visits in early July 2013, Cox overheard Coffey telling Miller that he

6

wanted to turn his property into a nursing home for other relatives after he died. Miller responded that she lived too far away, she did not have time to help Parson run a nursing home, and she wanted "no part of it." Cox testified that Coffey was upset with Miller after that visit, and Miller never returned. Cox testified that he never saw Parson telling Coffey what to do. According to Cox, "[y]ou didn't tell Kenney what to do. He told you what to do."

Deborah Brown, a social worker, met with Coffey twice after he was released from the hospital. The first visit was on June 19, 2013, when she performed the initial assessment for Coffey to receive hospice care. During that visit, Coffey signed a "do-not-resuscitate" order. Brown performed a cognitive assessment that day and did not have any concerns about Coffey's ability to sign the document. During that first visit, Miller told Brown she would be staying with Coffee to care for him "through the end." When Brown returned on June 26, 2013, however, Miller was not present, and Parson was caring for Coffey.

Megan Greenwood, a nurse care manager with Augusta Health Hospice of the Shenandoah, testified that she provided treatment to Coffey in June and July 2013. She visited Coffey at his home nine separate times. She recalled that Parson was Coffey's primary care giver. Greenwood testified that during all of her visits from June 19, 2013, through July 19, 2013, she did not notice any significant decline in Coffey's cognitive abilities. She testified that "[i]t seemed that he was able to make pretty clear decisions, according to my assessment." Greenwood further testified that during her visits she observed the interactions between Coffey and Parson, and none of those interactions caused her any concern. She stated that Coffey seemed pleased with the care he was receiving, and she never saw Parson act in an inappropriate manner or "tell Coffey what he had to do."

7

Mark Westebbe, the hospice chaplain, testified that he met with Coffey a total of three times. Westebbe never met Miller, but Parson and her husband were present at Coffey's house during Westebbe's last visit with Coffey on July 19, 2013. During that visit, Coffey spoke to Westebbe about how much he loved his house and land. Coffey openly pondered about who to leave it to and expressed concern that "his kids will sell it if he leaves it to them."

Parson testified that she is a caregiver for the Department of Medical Assistance Services. Parson stated that, starting in January 2013, she began to check in regularly on Coffey and assist him in getting to doctors' appointments. Parson would keep Miller informed of these appointments. Parson called Miller when Coffey was in the hospital for a week in May 2013, but Miller did not come visit. Parson called Miller again when Coffey was hospitalized in early June and Miller came to visit that time. Parson testified that during Miller's visit, Miller and Coffey got into an argument at the hospital. Miller told Parson that the argument started when Miller asked Coffey about his will and about "signing things over to her." Miller and Coffey were both upset after the argument and Miller left and went back to her home instead of staying with Coffey. Parson testified that Miller returned to visit Coffey a week later, and that Miller was upset after that visit as well. According to Parson, Miller was upset because Coffey had told Miller he was going to leave his house to Parson.

Parson testified that she never controlled or limited Coffey's visitors, and she never controlled or limited his access to the telephone. Coffey however, would sometimes instruct her not to allow certain visitors in the house and not to answer certain telephone calls, including calls from Miller. Parson testified that Coffey talked a lot about wanting to make a will, but he never told her he planned to leave anything to her. Coffey asked her to purchase a will kit for him, which she did on June 14, 2013, but she was not present when the 2013 will was prepared or

8

signed. The first time Parson saw Coffey's 2013 will was on July 21, 2013, the day before he died. Coffey showed Parson his 2013 will, in which he left her everything he owned. Parson testified that she was shocked, and asked Coffey why he had done that. According to Parson, Coffey said that he had given Miller every opportunity to come and live with him, but she had made no attempt to do so. Coffey stated, "if she's not going to live here now, she's not going to live here later." Coffey then explained that he wanted his property to stay in the family, and he also wanted his elderly sisters to be able to come and live there and for Parson to help care for them as well.

### D. The Jury Instructions

At the close of the evidence, the court considered the proffered jury instructions. Parson objected to jury instruction No. 8, arguing that it did not properly set forth the structure of how the presumption of undue influence is applied. The trial court stated that Miller was entitled to an instruction on the presumption of undue influence because Coffey was old, he named a beneficiary with whom he stood in a relationship of confidence or dependence, and he had previously expressed an intention to make a contrary disposition. Therefore, the trial court was going to give that instruction. However, the trial court stated that the presumption "does not end the inquiry." The trial court explained that in order to prove undue influence, the evidence must prove that the testator's free will was destroyed, and directed Parson to draft an instruction that would "complete the inquiry," and was consistent with this Court's decision in *Weedon v. Weedon*, 283 Va. 241 (2012). The trial court also refused to give Model Jury Instruction – Civil, No. 48.070, styled "Undue Influence," finding that it was an incorrect statement of the law. Both parties objected to the failure to give this instruction, but the trial court overruled their objections.

### E. Motion to Strike

Parson then moved to strike the evidence. She argued that Miller failed to present any evidence that Parson did anything "to manipulate, undermine or directly do anything to Mr. Coffey or to subvert his will." In Parson's view, Miller's own testimony was only that it was her opinion that Parson "may have done something," but that there was no evidence to support that. Accordingly, Parson argued the evidence did not "rise to the level of submitting the matter to the jury," and she asked the court to grant her motion. Miller responded that it was a question for the jury whether she had met her burden of proving undue influence. The trial court overruled the motion to strike. However, the court noted that although Miller had met her burden to trigger the presumption of undue influence, the court had "some real reservations about whether the evidence rises to the level to meet the rest – the rest of the inquiry" as imposed by *Weedon*. But the court stated that it was a matter for the jury to "sort out."

### F. Motion to Set Aside

The jury returned a verdict in favor of Miller. Parson then moved to set aside the verdict, maintaining that it was not supported by the law and evidence. Parson argued that although the presumption of undue influence might have arisen, there was no evidence to show that Parson robbed Coffey of his "independent spirit." Miller was unable to testify as to anything Parson did to somehow control Coffey, and she did not present any evidence from any source to prove that Parson exerted undue influence over Coffey. Relying on *Weedon*, Parson argued that there was no evidence that rose to the level of clear and convincing evidence to demonstrate undue influence by Parson.

Miller responded that the verdict was proper because Parson did not present any evidence to rebut the presumption of undue influence. The trial court stated that it "would not have come

to the same conclusion the jury did." The trial court agreed that Miller was entitled to the presumption of undue influence, but then stated, "I do think, however, that the presumption standing alone simply does not carry the day for the plaintiff. And on the evidence that I heard, I would have come to a different conclusion." However, the trial court determined that the jury properly decided the case, and it denied Parson's motion to set aside the verdict.

Parson appealed to this Court, and we awarded an appeal on the following assignments of error:

1. The trial court erred by refusing to grant [Parson]'s motion to strike at the conclusion of all the evidence. Although the trial court found that [Miller] was entitled to benefit from the presumption of undue influence, [Parson] satisfied her burden of producing evidence tending to rebut the presumption. The burden of persuasion, however, remained with [Miller]. [Miller] failed to present any evidence demonstrating that [Parson] exerted any undue influence in the procurement of [Coffey]'s Will. The jury returned a verdict in favor of [Miller] based solely upon the presumption of undue influence.

2. The trial court erred by refusing to sustain [Parson]'s motion to set aside the jury verdict and to enter judgment as a matter of law in favor of [Parson]. Again, although the trial court found that [Miller] was entitled to the benefit of the presumption of undue influence, [Parson] satisfied her burden of producing evidence tending to rebut the presumption. Based on the totality of the evidence and taking all inferences in favor of [Miller], no reasonable person could have found that [Miller] satisfied her burden of demonstrating undue influence by the standard of clear and convincing evidence. In this case, there is no evidence to support the jury's verdict, and the jury effectively returned a verdict in favor of [Miller] based solely upon the presumption of undue influence.

3. The trial court erred by instructing the jury on the presumption of undue influence. In this case, the presumption of undue influence operates to shift to [Parson] the burden of producing evidence tending to rebut the presumption. The presumption does not operate to shift the burden of persuasion to [Parson]. [Parson] satisfied her burden by producing evidence that no influence, undue or otherwise, was exerted by [Parson] to deprive [Coffey] of

11

his independent purpose in executing his Will. Consequently, the presumption was no longer applicable, and the trial court should not have informed the jury of the presumption of undue influence. The trial court's giving Instruction No. 8 to the jury was prejudicial error against [Parson].

4. The trial court erred by giving the jury the instruction on the presumption of undue influence because the instruction likely confused the jury. When considered with the remaining substantive instructions given in this case, the trial court's Instruction No. 8 allowed the jury to conclude that [Miller] was entitled to prevail if she demonstrated only the three elements identified by the trial court for the presumption of undue influence to arise. Instruction No. 8 did not inform the jury that the presumption of undue influence was not the end of the inquiry. The likely confusion created by Instruction No. 8 operated to the prejudice of [Parson].

5. The trial court erred by not giving Virginia Model Jury Instruction No. 48.070 regarding undue influence. The trial court concluded that longstanding Virginia Model Jury Instruction 48.070 is an incorrect statement of law. The trial court gave its Instruction No. 7[, in] which the trial court deleted the substantive instructions (second and third sentences) from Virginia Model Jury Instruction [48.070] and instead relied on the second paragraph of its crafted Instruction No. 8. The trial court's refusal to give Virginia Model Jury Instruction No. 48.070 in its entirety was error.

## II. Analysis

### A. Standard of Review

The standard of appellate review for a challenge to the sufficiency of the evidence is the same at the close of all the evidence and in a motion to set aside the jury verdict. *Bitar v. Rahman*, 272 Va. 130, 141 (2006).

> [W]here the trial court has declined to strike the plaintiff's evidence or to set aside a jury verdict, the standard of appellate review in Virginia requires this Court to consider whether the evidence presented, taken in the light most favorable to the plaintiff, was sufficient to support the jury verdict in favor of the plaintiff.

12

*Id.* (citation omitted). Where a trial court denies a motion to strike, we review the evidence to determine whether the action was in error because either "it is conclusively apparent that [the] plaintiff has proven no cause of action against [the] defendant," or "it plainly appears that the [circuit] court would be compelled to set aside any verdict found for the plaintiff as being without evidence to support it." *Egan v. Butler*, 290 Va. 62, 73-74 (2015) (quoting *Blue Ridge Serv. Corp. v. Saxon Shoes, Inc.,* 271 Va. 206, 218 (2006)). As a general rule, "[w]e will not set aside a trial court's judgment sustaining a jury verdict unless it is 'plainly wrong or without evidence to support it.'" *Fruiterman v. Granata*, 276 Va. 629, 637 (2008) (quoting Code § 8.01-680).

### B. The Presumption of Undue Influence

A presumption is a rule of law that compels the fact finder to draw a certain conclusion or a certain inference from a given set of facts. *Martin v. Phillips*, 235 Va. 523, 526 (1988). We have long recognized that, for procedural purposes, a presumption of undue influence may arise in cases involving wills and deeds. *Id.* at 527. With respect to wills, we have stated that a presumption of undue influence arises when three elements are established: (1) the testator was old when his will was established; (2) he named a beneficiary who stood in a relationship of confidence or dependence; and (3) he previously had expressed an intention to make a contrary disposition of his property. *Weedon v. Weedon,* 283 Va. 241, 255 (2012) (citing *Parish v. Parish*, 281 Va. 191, 202 (2011), quoting *Martin*, 235 Va. at 527).

The parties in this case do not dispute that Miller pled the three elements to establish the presumption of undue influence. They disagree however, on the effect of the presumption. The actual effect of presumptions has been widely debated by legal scholars and courts for decades, if not longer. *See* 2 McCormick on Evidence § 344 (John W. Strong ed., 4th ed. 1992). There are

13

two competing theories of presumptions. On one side is the "Thayer theory," set forth by Professor James B. Thayer, and also known as the "bursting bubble theory." *See id* at 462. This theory states that the only effect of a presumption is to shift the burden of production with regard to the presumed fact. *Id.* Under this theory, once the party against whom the presumption operates introduces countervailing evidence, the presumption "disappears like a bursting bubble and no longer has any impact on the trial." 1 Clifford S. Fishman, Jones on Evidence: Civil and Criminal § 4:10 (7th ed. 1992). The party who initially benefitted from this presumption still retains the burden of persuasion on the factual issue in question. *Id.* The competing theory of presumptions is often referred to as the "Morgan theory," credited to Professor Edward Morgan, and under this theory a presumption has the effect of shifting both the burden of production and the burden of persuasion on the factual issue in question against whom the presumption operates. 2 McCormick on Evidence § 344, at 471; 1 Jones on Evidence § 4:11.

In Virginia, we have not adopted a single rule governing the effect of all presumptions. *See Virginia Birth-Related Neurological Injury Comp. Program v. Young*, 34 Va. App. 306, 311 (2006). There are examples of both "Thayer theory" and "Morgan theory" presumptions in Virginia jurisprudence. *See Life & Cas. Ins. Co. of Tenn. v. Daniel*, 209 Va. 332, 340-42 (1968) (applying a "Morgan theory" approach in the presumption against suicide that arises in claims under life insurance policies and shifting the burden of production and persuasion); *Young*, 34 Va. App. at 312 (applying a "Morgan theory" presumption in birth injury cases and shifting the burden of production and persuasion on the issue of causation); *Volvo White Truck Corp. v. Vineyard,* 239 Va. 87, 91-92 (1990) (applying a "Thayer theory" approach and holding that the presumption that the bailee was negligent operated only to shift the burden of production and not the burden of persuasion); *see also* Rule 2:301 of the Virginia Rules of Evidence (adopting a

"Thayer theory" approach and stating that a rebuttable presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut the presumption, but does not shift the burden of proof). In Virginia, the effect of a particular presumption on the burdens of production and persuasion depends upon the purposes underlying the creation of the presumption. *See Young,* 34 Va. App. at 311 (holding that in order to achieve the purpose of Code § 38.2-5008(A), the presumption set forth in that statute must be construed according to the "Morgan theory").

Although we recognize both types of presumptions in Virginia, we have already had the opportunity to consider the presumption of undue influence and have previously determined that the presumption of undue influence shifts only the burden of production, not the burden of persuasion. *See Martin*, 235 Va. at 530. In *Martin*, we reversed a trial court that had applied the presumption in a manner shifting the burden of persuasion to the proponents of the will. *Id.* We explained that "once the presumption of undue influence arises, the burden of producing the evidence tending to rebut the presumption shifts to the opposing party." *Id.* at 529. However, we made clear that the burden of persuasion "always remains" with the contestant of the will. *Id.* at 530.

We reiterated that holding in our most recent decision to consider a claim of undue influence in the creation of a will, *Weedon v. Weedon*, 283 Va. 241 (2012). In *Weedon*, we agreed with the trial court that the evidence presented by the contestant of the will gave rise to the presumption of undue influence. *Id.* at 255. However, we made clear that this does not end the inquiry:

> The undue influence which will vitiate a will must be of such a character as to control the mind and direct the action of the testator. It must be sufficient to destroy free agency on the part of the . . . testator; it must amount to coercion — practically duress. It

15

must be shown to the satisfaction of the court that the party had no free will. Resistible persuasion, solicitation, advice, suggestions, and importunity do not constitute sufficient evidence of undue influence. *The burden of showing undue influence rests upon those who allege it*, and it cannot be based upon bare suggestion, innuendo, or suspicion.

*Weedon*, 283 Va. at 255-56 (internal citations omitted) (emphasis added). We held that undue influence must be established by clear and convincing evidence, and the ultimate burden of proof "is always upon him who alleges fraud." *Id.* at 255, 257.

We acknowledge that some of our prior decisions in cases involving allegations of undue influence have used the terms "presumption" and "inference" interchangeably. *Compare Weedon*, 283 Va. at 255, *Parish*, 281 Va. at 202, and *Martin*, 235 Va. at 52, *with Gill*, 219 Va. at 1106 ("An inference of undue influence may be warranted when the three circumstances set forth in *Culpepper* are established."), and *Culpepper v. Robie*, 155 Va. 64, 89 (1930) ("This evidence raises a strong inference of undue influence which must be satisfactorily explained by the proponent in order for the will to stand."). An inference, however, does not invoke the procedural consequences of shifting the burden of production. *Martin*, 235 Va. at 526, fn.2. Our more recent decisions in *Weedon* and *Martin* make clear that these cases involve a presumption, not an inference, and that the presumption of undue influence in Virginia is of the "Thayer theory" variety. Accordingly, the only effect of the presumption is to shift the burden of production to the proponent of the will. The contestant of a will always retains the burden of persuasion, and in order to prevail on a claim of undue influence, the contestant of a will must prove undue influence by clear and convincing evidence. *Weedon*, 283 Va. at 255-56.

Having clarified the type of presumption that applies in cases alleging undue influence in the creation of a will, we will take this opportunity to set forth the legal effect of this presumption in such cases. If a contestant of a will pleads sufficient facts to allege that (1) the

16

testator was old when his will was established; (2) he named a beneficiary who stood in a relationship of confidence or dependence; and (3) he previously had expressed an intention to make a contrary disposition of his property, such allegations would be sufficient to survive demurrer. At trial, if a contestant of a will puts forth evidence to prove these three elements, the presumption would be established and the contestant would survive a motion to strike his evidence at the close of the plaintiff's evidence.

Once the presumption of undue influence is established, the burden of production then shifts to the proponent of the will. If the proponent of the will puts forth no evidence at this point, the presumption of undue influence is sufficient to form the basis of a verdict in the contestant's favor. In order to rebut the presumption, the proponent of the will is required to put forth countervailing evidence tending to prove that the decedent's will was not overborne. We have explained that "not all influence is undue in the legal sense. To be classified as 'undue,' influence must place the testator in the attitude of saying, 'It is not my will but I must do it.'" *Weedon*, 283 Va. at 255-56. If the proponent of the will produces evidence tending to prove that the decedent's will was not overborne, the presumption "disappears like a bursting bubble." 1 Jones on Evidence § 410. *See Martin*, 235 Va. at 529. The contestant of the will then retains the burden of proving undue influence by clear and convincing evidence. *Weedon*, 283 Va. at 256.

If the presumption has been rebutted and has "disappeared," the jury should not be instructed as to the presumption. *See Daniel*, 209 Va. at 336 (explaining that under the "Thayer theory," if a presumption is rebutted the jury is not instructed on that presumption), and 2 McCormick on Evidence § 344, at 462 (explaining that if the presumption is rebutted there is no need to instruct the jury with regard to the presumption). In order to submit the question of undue influence to the jury, "there must be evidence presented which is sufficient to show that

17

the person executing the will was deprived of his volition to dispose of his property as he wished." *Wilroy v. Halbleib*, 214 Va. 442, 446 (1974). If such evidence is insufficient to submit to the jury, the proponent's motion to strike the contestant's evidence should be granted. *See Pace v. Richmond*, 231 Va. 216, 225 (1986).

### C. Sufficiency of the Evidence

Having set forth the law that applies to claims of undue influence, we must now determine whether Miller's evidence was sufficient to support such an allegation. In resolving the issue whether the evidence was sufficient to support a finding of undue influence, we view the evidence in the light most favorable to Miller, the party who prevailed below before the jury in contesting the will. *Gill v. Gill*, 219 Va. 1101, 1103 (1979). There is no dispute that Coffey was elderly and ill when he prepared his will. Miller's evidence demonstrated that Parson was Coffey's caregiver, and he was in a close, dependent relationship with her. Additionally, Miller presented evidence that Coffey had previously expressed an intention to leave his estate to Miller, not Parson. Considering all of this evidence, it is clear that Miller was entitled to a presumption of undue influence, and the trial court did not err in so finding.

Now we must examine the evidence to determine whether the presumption of undue influence was rebutted by the production of countervailing evidence. In this case, Parson presented multiple witnesses who all testified that Coffey was never deprived of his free will to dispose of his property as he wished. Brenneman, who witnessed Coffey sign the will, testified that Coffey was "the one who told people what to do" when the will was signed. Gunick, Coffey's friend of over 30 years, stated that even in the last month when he was sick, Coffey "had a mind of his own. He did what he wanted," and he was not submissive in any way. Cox,

18

Coffey's nephew, testified that he never saw Parson telling Coffey what to do. According to Cox, "[y]ou didn't tell Kenney what to do. He told you what to do."

Greenwood, the hospice nurse, testified that during all of her visits from June 19, 2013, through July 19, 2013, she did not notice any significant decline in Coffey's cognitive abilities. She testified that Coffey "was able to make pretty clear decisions, according to my assessment." Greenwood further testified that during her visits she observed the interactions between Coffey and Parson, and none of those interactions caused her any concern. She stated that Coffey seemed pleased with the care he was receiving, and she never saw Parson act in an inappropriate manner or "tell Coffey what he had to do." Parson produced countervailing evidence tending to rebut the presumption of undue influence. Accordingly, the presumption of undue influence "disappeared," and the jury should never have been instructed on the presumption. *See Daniel*, 209 Va. at 336, and 2 McCormick on Evidence § 344, at 462.

The evidence presented by both parties made clear that Coffey had a strong personality and was a person who wanted things done a certain way. When Miller was asked what Parson "did to gain control" over Coffey, Miller replied, "I don't know." Additionally, neither Miller nor any of her witnesses saw or spoke with Coffey in the last few weeks of life, and Miller presented no evidence that at the time he made his 2013 will, he was under Parson's influence.

The evidence also established that Coffey wanted Miller to come live with him and care for him during the last months of life. Miller did not do this, and that upset Coffey. Instead, Parson, his niece and close neighbor, voluntarily took on the role of his primary caregiver. There was no evidence presented that Parson limited Coffey's access to visitors or otherwise controlled his actions. There is simply no evidence in this record to demonstrate that Coffey's "will was

19

overridden," or that Parson ever placed such undue influence on Coffey that he was put in a position of saying, "[i]t is not my will but I must do it." *Weedon*, 283 Va. at 255-57.

Parson has argued that the trial court erred in refusing to grant her motion to strike at the close of all evidence. In *Wilroy*, we held that:

> To justify submission of the question of undue influence to a jury, there must be evidence presented which is sufficient to show that the person executing the will was deprived of his volition to dispose of his property as he wished. There must be manifest irresistible coercion which controls and directs the testator's actions.

214 Va. at 446. In *Wilroy,* we found that because there was no evidence of undue influence, the trial court erred in not striking the evidence on that issue and removing it from the jury's consideration. *Id.* In *Pace v. Richmond*, we also found the evidence insufficient to submit the question of undue influence to the jury. 231 Va. at 225. As we stated in *Pace*, "the question whether testimony tending to show undue influence is sufficiently probative to submit to the jury is a question to be considered by the chancellor at the threshold." *Id.* A trial court must grant a motion to strike the contestant's evidence "if it is conclusively apparent that the [contestant] has proven no cause of action against the [proponent]," or "it plainly appears that the trial court would be compelled to set aside any verdict found for the [contestant] as being without evidence to support it." *See Blue Ridge Service Corp. of Virginia*, 271 Va. at 218.

Even when viewing all of the testimony and inferences in the light most favorable to Miller, there is simply no evidence that Coffey's will was ever overborne, and that he was deprived of his volition to dispose of this property as he wished. Although Miller established the presumption of undue influence, Parson produced evidence sufficient to rebut that presumption, and the presumption disappeared. Miller, who retained the burden of proof, failed to establish by clear and convincing evidence that Coffey's 2013 will was the product of undue influence. The

20

evidence was insufficient as a matter of law to support a finding of undue influence. The trial court should have granted Parson's motion to strike the evidence at the close of all evidence, and this question should never have been submitted to the jury. Accordingly, the trial court erred as a matter of law in failing to grant the motion to strike, and the judgment will be reversed.[*]

### III. Conclusion

For the reasons stated, we will reverse the judgment of the trial court and remand for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

---

[*] Parson has also assigned error to the trial court's failure to grant her motion to set aside the verdict and the trial court's rulings with respect to certain jury instructions. Because we hold that the trial court erred in denying Parson's motion to strike, it is unnecessary to address the remaining assignments of error. *See Weedon*, 283 Va. at 259 n. 8 (declining to address remaining assignments of error after concluding the evidence was insufficient as a matter of law to prove undue influence).