COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judge Chaney and Senior Judge Humphreys
Argued by videoconference


JESSE DEAN BEEBOUT

                                                  MEMORANDUM OPINION* BY
v.        Record No. 1466-23-2             CHIEF JUDGE MARLA GRAFF DECKER
                                                         APRIL 8, 2025
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
                          William E. Glover, Judge

            Kevin E. Calhoun for appellant.

            Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
            Attorney General, on brief), for appellee.


      Jesse Dean Beebout appeals his convictions, following a jury trial, for first-degree

murder, shooting in the commission of a felony, and use of a firearm in commission of a felony.

*See* Code §§ 18.2-32, -53, -53.1.  Beebout contends that the trial court erred when it excluded

expert testimony, allowed certain questions during cross-examination, and denied his motion for

a mistrial.  He also argues that the evidence was insufficient to prove first-degree murder.  For

the following reasons, we disagree and affirm the convictions.

---

      * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

On April 30, 2022, Beebout shot and killed Shawn Hastings in the parking lot of Fatty's Tap House. The two first interacted earlier that evening when Beebout "sat down beside" Hastings's companion, Dana Williams, at the bar and began talking to her. Hastings, who had been socializing at the other end of the bar, approached Beebout, put his hand on Beebout's back in a friendly manner, and asked Beebout to move. Beebout ignored the request. A patron Hastings had been drinking with at the other end of the bar intervened and asked Beebout, in a "more aggressive" manner, to move. To deescalate the situation, Hastings offered to buy the other man a drink. When Hastings and the other man moved away, the bartender asked Beebout to leave the bar. Reluctantly, Beebout left. He then walked to the restaurant next door and ordered a beer. About an hour later, shortly after 11:00 p.m., Beebout closed his tab and left the restaurant.

Around the same time, Hastings and Williams left Fatty's. The pair walked in front of a parked car in the lot outside of Fatty's entrance. Beebout got out of that car and said, in a monotone voice, "do you remember me." Hastings told Williams to go to her car. Williams complied, noting that Hastings did not seem angry or afraid. As Williams walked to her car, she heard gunshots. She turned around and saw Beebout standing over Hastings and shooting downward. Hastings died of multiple gunshot wounds to the chest. He had been shot five times.

After the shooting, Beebout drove home and was arrested the next morning. Officers searched his home and found the murder weapon on his bedside table. The police also recovered

---

[1] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires that we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn" from that evidence. *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018) (per curiam)).

Beebout's concealed-carry weapons permit. In Beebout's car, officers found the baseball cap Beebout wore during the incident. The cap had a patch on it depicting an admission ticket with "Valhalla—Admit One" inscribed. In the trunk, officers found a collection of various Velcro patches.

During his police interview, Beebout claimed that when he went to leave the parking lot in his car, Hastings tried to carjack him. He said that as he fought off Hastings, he discharged his entire magazine. Beebout had a bullet wound on one hand and a scrape on the other.

The Commonwealth charged Beebout with first-degree murder, shooting in the commission of a felony, and use of a firearm in the commission of a felony. At trial, the Commonwealth's evidence included testimony from investigating detectives, Williams, and the medical examiner. Photographs taken of the items found in Beebout's car were also entered into evidence without objection. The parties stipulated that Hastings's blood alcohol content (BAC) in the toxicology report reflected that he had consumed between 7.8 and 11.7 alcoholic drinks the night he was killed.

After the Commonwealth rested, the court considered the prosecutor's motion *in limine* to exclude the testimony of Dr. Robyn Amos-Kroohs. In considering the motion, the trial court heard testimony from the doctor outside the presence of the jury. She explained generally the effects of the amount of alcohol found in Hastings's blood. The court granted the Commonwealth's motion to prohibit Amos-Kroohs's testimony.

Beebout testified in his own defense. He explained that at Fatty's, he sat next to Williams at the bar as he waited to pay his tab. According to Beebout, moments after he sat down, Hastings grabbed his shoulder and asked him to move. Beebout said he did as Hastings requested. He claimed that Hastings walked away but the patrons Hastings had been drinking

- 3 -

with came over and also confronted him. He testified that when he left Fatty's at the bartender's direction, he was not angry with Hastings or upset by the encounter.

According to Beebout, after departing Fatty's, he walked to the restaurant next door and ordered a beer. He stayed there for about an hour before he left and returned to his car. Beebout explained that upon returning to his car, he took his gun and gun holster out of his glove compartment and placed it on his right hip. He testified that he had a concealed-carry weapons permit and that he always carried a registered pistol with him except while in bars. Beebout explained that he rearmed himself that night out of habit and denied that he intended to shoot Hastings.

Beebout provided his account of what followed. He sat in his parked car, and Hastings opened his door and pulled him out of the driver's seat. Beebout testified that, during the ensuing struggle, Hastings put his left hand behind his back as if reaching for a weapon. Beebout said that he shot Hastings out of fear that Hastings would stab or shoot him. During the commotion, Beebout also shot his own hand. He denied firing additional shots while Hastings was lying on the ground.

On cross-examination, the Commonwealth asked Beebout about the significance of the Valhalla patch on the hat he wore on the day of the incident and the slogans on other patches that were found in the trunk of his car. Beebout claimed that the patches came in a bundle and he did not specifically select them. The Commonwealth asked about the patch with the phrase, "I'm your Huckleberry." The prosecutor asked if Beebout had heard "the reference in Tombstone" when "Doc Holliday, right before he guns a man down[,] . . . says, I'll be your Huckleberry." Beebout's counsel objected and made a motion for a mistrial. The court ruled that the Commonwealth could inquire about the patches found in his possession but could not tell Beebout what the patches referenced. The court denied the mistrial motion. Instead, it cautioned

- 4 -

the jurors "not to consider what [the prosecutor] told you what the patch means. The information you need to consider is the information that comes from the defendant."

After closing arguments and deliberations, the jury convicted Beebout of the charges. He was sentenced to fifty-eight years of incarceration with thirteen years suspended.

ANALYSIS

I.  Exclusion of Expert Testimony

Beebout argues that the trial court erred when it excluded the expert testimony of Dr. Amos-Kroohs.

In a proffer, Amos-Kroohs testified that she had reviewed a certificate of analysis from the Department of Forensic Science and Hastings's posthumous BAC was around 0.286% by weight by volume. She explained that she would expect an individual with that BAC to exhibit signs of intoxication such as slurred speech and motor coordination issues. Amos-Kroohs acknowledged, however, that if an individual had a higher alcohol tolerance, he would exhibit signs associated with a lower level of intoxication.

Amos-Kroohs explained that alcohol is a central nervous system depressant that disinhibits areas of the brain associated with judgment and impulse control. She testified that "alcohol works to create exaggerated emotional states, so alcohol itself does not create anger, but if an individual is already experiencing that emotional state, alcohol may exaggerate it." Amos-Kroohs added that a high BAC could lead an individual to respond to a situation with heightened emotion.

The Commonwealth moved to exclude testimony from Amos-Kroohs.[2] The prosecutor argued that the proffered testimony was speculative as to how alcohol specifically affected

---

[2] For the purposes of the motion, Amos-Kroohs was recognized as an expert in forensic toxicology.

Hastings's level of aggression on the night of his death. The Commonwealth also argued that the relevant portion of Amos-Kroohs's testimony—namely that alcohol disinhibits a consumer's cognitive processes and affects impulse control—was within the common knowledge of the jury. The trial court granted the Commonwealth's motion to exclude the challenged testimony. The court specifically found Amos-Kroohs's testimony would be speculative if she was allowed to testify about Hastings's likely actions when he encountered Beebout in the parking lot.

"[W]e review 'a trial court's decision to admit or exclude expert testimony under an abuse of discretion standard.'" *Smith v. Commonwealth*, 78 Va. App. 371, 389 (2023) (alteration in original) (quoting *Arch Ins. Co. v. FVCBank*, 301 Va. 503, 515 (2022)). This "standard draws a line—or rather, demarcates a region—between the unsupportable and the merely mistaken, between the legal error . . . that a reviewing court may always correct, and the simple disagreement that, on this standard, it may not." *Jefferson v. Commonwealth*, 298 Va. 1, 10-11 (2019) (alteration in original) (quoting *Reyes v. Commonwealth*, 297 Va. 133, 139 (2019)). Significantly, "[t]he abuse of discretion standard requires a reviewing court to show enough deference to a primary decisionmaker's judgment that [it] does not reverse merely because it would have come to a different result in the first instance." *Commonwealth v. Thomas*, 73 Va. App. 121, 127 (2021) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 212 (2013)). The "bell-shaped curve of reasonability" underpinning appellate review for abuse of discretion "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Commonwealth v. Barney*, 302 Va. 84, 94 (2023) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). Simply put, "[a] reviewing court can conclude that an abuse of discretion occurred only when reasonable jurists could not differ about the correct result." *Howard v. Commonwealth*, 74 Va. App. 739, 753 (2022).

We start with the fundamental principle that the purpose of allowing "expert testimony is to assist the trier of fact in understanding the evidence." *Watson v. Commonwealth*, 298 Va. 197, 205 (2019). In a Virginia criminal proceeding, a qualified expert witness is allowed to testify if "the subject matter is beyond the knowledge and experience of ordinary persons, such that the jury needs expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions." Va. R. Evid. 2:702(a)(ii); *see Payne v. Commonwealth*, 277 Va. 531, 542 (2009). However, expert testimony is inadmissible if it is speculative. Va. R. Evid. 2:702(b); *Tittsworth v. Robinson*, 252 Va. 151, 154 (1996).

We conclude that the trial court did not abuse its discretion by excluding the testimony that Beebout intended to elicit from Dr. Amos-Kroohs. In her proffered testimony, Amos-Kroohs provided that alcohol can heighten *all* emotions. She also opined that alcohol "does not create anger[] but if an individual is already experiencing that emotional state, alcohol may exaggerate it." Beebout intended to use Dr. Amos-Kroohs's general description of the effects of alcohol on emotions to establish that Hastings's conduct at the time of the incident was aggressive. The trial court did not abuse its discretion in concluding that it was purely speculative that Hastings was aggressive because of his level of intoxication. Amos-Kroohs's testimony about how the average person experiences intoxication from alcoholic beverages failed to explain how Hastings specifically was affected by the alcoholic beverages he consumed. "As such, it called for speculation and surmise on the part of the trier of fact and was improper."[3]

---

[3] Contrary to Beebout's suggestion, *Lomax v. Commonwealth*, 228 Va. 168, 172-73 (1984), does not compel a different conclusion. In that case, the Supreme Court of Virginia held that "evidence that excessive use of Preludin can cause aggressiveness" was "relevant . . . and necessary" to the defendant's claim that the victim provoked the attack. *Id.* at 173. The evidence in that case was that Preludin specifically could trigger aggression. *Id.* at 171. The testimony at issue tended to establish that the victim became aggressive due to the Preludin. That evidence differs critically from the proffered testimony in this case that alcohol generally heightens emotions, giving no insight into how the alcohol affected Hastings.

- 7 -

*Molina v. Commonwealth*, 47 Va. App. 338, 368, *aff'd*, 272 Va. 666 (2006); *see also Hubbard v. Commonwealth*, 243 Va. 1, 12-14 (1992) (affirming the exclusion of evidence that the driver who died in a collision with the defendant's car was intoxicated as speculative in light of the possibility that the victim contributed to the accident). An "opinion based on a 'possibility' is . . . purely speculative and, hence, inadmissible."[4] *Spruill v. Commonwealth*, 221 Va. 475, 479 (1980).

Beebout also maintains that exclusion of the expert testimony violated his constitutional right to due process because "it prevented him from putting forth relevant evidence to support his defenses." A defendant has "a constitutional right to present relevant evidence." *Neeley v. Commonwealth*, 17 Va. App. 349, 356 (1993) (referencing the due process requirement "that defendants have a fair opportunity to defend against the government's charges"). This right, however, "must on occasion give way to the broader interest of the government in fairly administering justice." *Id.* Specifically, it is not a due process violation to exclude "evidence that produces only speculative inferences." *See Thomas v. Commonwealth*, 82 Va. App. 80, 120 (2024) (en banc) (quoting 29 Am. Jur. 2d *Evidence* § 295 (2019)); *see Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (stating that both prosecutors and defendants "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence").

For these reasons, the trial court did not err when it excluded Amos-Kroohs's testimony.

---

[4] Based on our conclusion that the trial court did not abuse its discretion by excluding speculative testimony, we do not address the Commonwealth's alternative argument that the testimony was inadmissible because "[t]he possible effects of alcohol consumption are within the common knowledge of the jury." *See, e.g.*, *Baez v. Commonwealth*, ___ Va. ___, ___ (Dec. 19, 2024) (explaining the doctrine of judicial restraint); *Commonwealth v. White*, 293 Va. 411, 419 (2017) (same).

## II. Cross-Examination of Beebout

Beebout argues that the trial court erred when it allowed the Commonwealth to question him regarding the patches found on his baseball cap and in the trunk of his car. By extension, he contends that the court erred by denying his accompanying motion for a mistrial. Beebout suggests that the patches were not relevant and the Commonwealth used them to "inflame the passions of the jury."

Photographs of the patches were introduced into evidence without objection. When the Commonwealth asked Beebout about the significance of the Valhalla patch on the hat he wore on the day of the incident, Beebout said that he "love[d] the show on the History Channel."[5] When asked if he knew what Valhalla was, Beebout replied, "I think it's like their religion or something like that." When asked why he got the patch, Beebout stated it was "random[ly]" included in a bundle of other patches he had purchased.

The prosecutor then questioned Beebout about other patches that were found in the trunk of his vehicle. When asked about the meaning of a mustache-shaped patch inscribed with the phrase, "I'm your Huckleberry," Beebout testified that he did not know and that it came in a "random bundle of patches." The prosecutor asked if he had heard "the reference in Tombstone" when "Doc Holliday, right before he guns a man down[,] . . . says, I'll be your Huckleberry." At that point, Beebout objected.

Outside the jury's presence, Beebout made a motion for a mistrial. He argued that the Commonwealth was improperly attempting to use the patches "to infer a violent disposition or a disposition to kill." The prosecutor noted that the patches were found in the trunk of Beebout's

---

[5] Detective Justin Basil of the Spotsylvania County Sheriff's Office explained, without objection, that in "Norse Mythology, whenever someone was killed in battle[,] half . . . would be chosen by Odin to go to Valhalla as kind of an honorary resting place." Over Beebout's objection, Detective Basil noted that "[i]t's become popular in pop culture for being willing to fight to the death as a respectful ending."

car and that photographs of the patches were already in evidence. He asserted that Beebout's credibility was at issue and the patches were relevant to reveal his state of mind.

The trial court noted that, during direct examination, Beebout had testified about his state of mind and that he did not feel angry or intend to shoot Hastings. The court opined that the items found in Beebout's possession potentially could be used "to rebut or impeach those statements" and therefore the questions aimed to elicit relevant testimony. It held that the Commonwealth could *ask* about his patches. The court also ruled, though, that the prosecutor could not *instruct* Beebout on the meanings of the patches. It denied Beebout's motion for a mistrial but agreed to give a cautionary instruction. After the jury returned, the court cautioned the jurors "not to consider what [the prosecutor] told you what the patch means. The information you need to consider is the information that comes from the defendant."

The prosecutor then asked Beebout about several other patches found in his vehicle. The first patch appeared to be a Wrigley's gum pack which read "Don't Shoot Once Double Tap Shoot Twice." Beebout stated that this patch was also in a random bundle and that he did not know its meaning. The prosecutor next directed Beebout's attention to a patch that depicted "Mr. Rogers" holding a gun and read, "Stay Strapped or Get Clapped Neighbor." Beebout indicated that it referenced "using sexual protection, like condoms." Finally, the prosecutor asked Beebout about the meaning of a patch that read "Disregard Females, Acquire Currency." Beebout explained that the patch was "a joke using Old English for rap music lyrics" meaning "Fuck Bitches, Get Money."

In a criminal case, if the defendant waives "his privilege of not giving evidence against himself" and testifies, he is "*subject to cross-examination as any other witness*." *Drumgoole v. Commonwealth*, 26 Va. App. 783, 786 (1998) (quoting Code § 19.2-268). "Cross-examination . . . entitles the Commonwealth to bring out . . . facts relating to the guilt or innocence of the

accused . . . ." *Id.* (alterations in original) (quoting *Thaniel v. Commonwealth*, 132 Va. 795, 806 (1922)). "The scope of cross-examination in general, and the extent of testimonial impeachment in particular, are left to the sound discretion of the trial court and are not subject to review unless plainly abused." *Scott v. Commonwealth*, 18 Va. App. 692, 693-94 (1994); *see Spruill*, 221 Va. at 485. "However, 'while the liberties of the cross-examiner are very great,' they are not unlimited." *Scott*, 18 Va. App. at 694 (quoting *Barnard v. Commonwealth*, 134 Va. 613, 622 (1922)).

Testimony, to be admissible, must be relevant to an issue on trial. *See* Va. R. Evid. 2:402(a). And even relevant evidence should be excluded if its "probative value" is "substantially outweighed by . . . the danger of unfair prejudice." Va. R. Evid. 2:403(a)(i). Once evidence is deemed relevant, the test for exclusion sets a high bar. "Virginia law . . . intervenes only when the alleged prejudice tends to inflame irrational emotions or leads to illegitimate inferences." *Thomas v. Commonwealth*, 44 Va. App. 741, 758, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005).

Beebout was on trial for first-degree murder. To sustain a conviction for first-degree murder, the Commonwealth was required to prove that Beebout acted with premeditation. Based on the facts of this case, his testimony about the patches was relevant to his mens rea. On direct examination, Beebout testified that when he left Fatty's, he was not upset with Hastings. He claimed that when he shot Hastings about an hour later, it was because he feared for his life. The prosecutor's questions on cross-examination about the meaning of the patch on the baseball cap he was wearing and others found in his possession were probative to elicit testimony about his state of mind at the time of the killing. In answering these questions, Beebout claimed that none of the patches related to gun violence. Further, photographs of the specific patches were entered into evidence without objection. And the jury was instructed to consider only Beebout's

- 11 -

responses regarding the patches. The Commonwealth's questions asking Beebout to explain the meanings of particular patches did not tend to "inflame irrational emotions" or give rise to "illegitimate inferences." *See Thomas*, 44 Va. App. at 758. Consequently, the trial court acted within its discretion by allowing the Commonwealth to cross-examine Beebout about the meanings of the patches he possessed at the time of the murder.

Turning to Beebout's request for a mistrial after the Commonwealth asked him if he was familiar with the Tombstone reference, we likewise analyze "the denial of a motion for a mistrial under the abuse of discretion standard of review." *See Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020). Here the trial court instructed the jury specifically to disregard the prosecutor's explanation of what the patches meant and consider only information from Beebout's testimony. The jury is "presumed to follow prompt, explicit, and curative instructions." *Tizon v. Commonwealth*, 60 Va. App. 1, 14 (2012) (quoting *Elliott v. Commonwealth*, 267 Va. 396, 418 (2004)).

For these reasons, the trial court did not abuse its discretion by allowing the Commonwealth to cross-examine Beebout about the patches found in his possession and refusing to grant a mistrial.

### III. Sufficiency of the Evidence

Finally, Beebout argues that the evidence was insufficient to prove he acted with the premeditation necessary to support his conviction for first-degree murder. He claims that the evidence instead established that he shot Hastings either in the heat of passion or in self-defense.[6]

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to

---

[6] Beebout primarily challenges the sufficiency of the evidence supporting his conviction for first-degree murder. His sufficiency challenge relating to his convictions for shooting in the commission of a felony and use of a firearm in commission of a felony is limited to his argument regarding self-defense.

support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). In conducting this review, the "appellate court does not 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Barney*, 302 Va. at 97 (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams*, 278 Va. at 193). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

In conducting our review, this Court likewise gives deference to the fact finder's assessment of witness credibility. "Determining the 'credibility of the witnesses and the weight of the evidence' are tasks left 'solely [to] the trier of fact' unless those determinations are 'plainly wrong or without evidence to support [them].'" *Nelson v. Commonwealth*, 73 Va. App. 617, 622 (2021) (alterations in original) (quoting *Wactor v. Commonwealth*, 38 Va. App. 375, 380 (2002)). Such is the case because the fact finder, in this case the jury, "has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)).

Premeditation is an element of first-degree murder. *See* Code § 18.2-32. "To premeditate means to adopt a specific intent to kill . . . ." *Avent v. Commonwealth*, 279 Va. 175, 208 (2010) (quoting *Remington v. Commonwealth*, 262 Va. 333, 352 (2001)). "[E]vidence showing that the premeditation was only slight or momentary is sufficient to sustain the conviction. This is so because 'premeditation is an intent to kill that needs to exist only for a

- 13 -

moment.'" *Jackson v. Commonwealth*, 267 Va. 178, 204 (2004) (citation omitted) (quoting *Green v. Commonwealth*, 266 Va. 81, 104 (2003)).

Significant to the analysis, "[p]remeditation is a factual question, reserved for determination by the [jury]." *Martinez v. Commonwealth*, 42 Va. App. 9, 22 (2003). In determining whether premeditation existed, "the jury may properly consider the brutality of the attack . . . and the defendant's lack of remorse and efforts to avoid detection." *Avent*, 279 Va. at 208 (quoting *Epperly v. Commonwealth*, 224 Va. 214, 232 (1982)). One circumstance commonly associated with first-degree murder is shooting the victim "at close, and thus predictably fatal, range." *Jackson v. Virginia*, 443 U.S. 307, 325 (1979). Another is firing a weapon more than once. *Chandler v. Commonwealth*, 249 Va. 270, 280 (1995).

Consistent with determining state of mind, the jury also had to decide whether Beebout shot Hastings in the heat of passion or in self-defense. *See, e.g.*, *Hines v. Commonwealth*, 292 Va. 674, 679-80 (2016) (considering the evidence supporting the appellant's claim of self-defense); *Dandridge v. Commonwealth*, 72 Va. App. 669, 682 (2021) (determining whether the record contained credible evidence that the appellant acted in the heat of passion). Heat of passion and self-defense are two separate legal defenses. "Heat of passion is a defense based on a defendant's lack of malice." *Washington v. Commonwealth*, 75 Va. App. 606, 619 (2022). In other words, heat of passion and malice are mutually exclusive. Self-defense is an affirmative defense based on a reasonable fear of death or serious bodily harm. *Id.* at 617.

In convicting Beebout of first-degree murder, the jury necessarily accepted the Commonwealth's evidence and rejected Beebout's version of events. *See Dalton*, 64 Va. App. at 525 (noting that a jury, as fact finder, is responsible for evaluating the credibility of witnesses). The Commonwealth's evidence established that Beebout's car was stopped in front of the entrance to Fatty's Tap House when Hastings and Williams left the restaurant around 11:00 p.m.

- 14 -

As Hastings and Williams walked across the parking lot, Beebout got out of his car and confronted the pair, stating, "do you remember me," necessarily referencing the earlier encounter in the bar. Hastings stopped at the corner of Beebout's car and told Williams to continue to her car. As Williams made her way to her vehicle, she heard gunshots, turned around, and saw Hastings on the ground while Beebout stood over him repeatedly firing a gun.[7] Beebout discharged his entire magazine, shooting Hastings five times. And rather than calling 911 or administering aid, Beebout simply drove home and went to sleep. *See Lambert v. Commonwealth*, 70 Va. App. 740, 760 (2019) (noting that flight after an offense is committed is evidence of guilt); *see also Ford v. Georgia*, 903 S.E.2d 1, 5 (Ga. 2024) (noting that the fact that the defendant "left the scene without rendering aid" supported the finding that the killing was malicious).

At trial, Beebout testified that he acted out of fear for his safety and claimed that Hastings attacked him first. "[I]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Washington*, 75 Va. App. at 616 (quoting *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011)).

Considering the totality of the circumstances, a reasonable jury could conclude that Beebout acted with premeditation when he shot Hastings. Likewise, the jury could reasonably reject Beebout's claims of heat of passion or self-defense. The evidence, when viewed in the

---

[7] The recording from Beebout's dash camera does not show the shooting itself, but it nonetheless corroborates Williams's testimony about the location of Beebout's car, the relative positions of Hastings and Williams, and Williams's act of turning back after reaching her own car. *See generally Barney*, 302 Va. at 97 (recognizing the appellate court's duty to defer to "the factfinder's 'interpretation of all of the evidence, including video evidence[,]' presented at trial" (quoting *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022))).

light most favorable to the Commonwealth, supports the jury's findings. Consequently, the evidence was sufficient to support the convictions.

CONCLUSION

The trial court acted within its discretion by excluding testimony from Beebout's expert. In addition, the court did not err by allowing the Commonwealth to cross-examine him about certain patches found in his possession and denying his related motion for a mistrial. Finally, the evidence was sufficient to support the findings that Beebout shot Hastings with premeditation and not in the heat of passion or self-defense. Therefore, we affirm the convictions for first-degree murder and the related offenses. We remand the case solely for the correction of a clerical error in the conviction and sentencing orders.[8]

*Affirmed and remanded.*

---

[8] The conviction and sentencing orders, while properly citing the code section proscribing the offense of shooting in the commission of a felony, improperly state that Beebout was convicted of "assault" in the commission of a felony. Consequently, we remand solely for correction of the clerical error in the conviction and sentencing orders. *See* Code § 8.01-428(B); *Bagley v. Commonwealth*, 73 Va. App. 1, 30 n.10 (2021).